**Herbert EISENSTADT, Joseph Meyer, and Harvey Meyer, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,**

v.

**CENTEL CORPORATION, John P. Frazee, Jr., and J. Stephen Vanderwoude, Defendants–Appellees.**

Nos. 96–2870, 96–3028.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 24, 1997.

Decided May 12, 1997.

Rehearing and Suggestion for Rehearing En Banc Denied June 19, 1997.

Michael J. Freed, Michael B. Hyman, Ellyn M. Lansing, Much, Shelist, Freed, Denenberg & Ament, Chicago, IL, Patricia M. Hynes (argued), Deborah Clark–Weintraub, Kenneth J. Vianale, Milberg Weiss, Bershad, Hynes & Lerach, New York City, Arthur N. Abbey, Judith L. Spanier, Abbey & Ellis, New York City, Michael D. Craig, Schiffrin & Craig, Buffalo Grove, IL, for Herbert Eisenstadt, Joseph Meyer, Harvey Meyer and Brenda Drucker in No. 96–2870.

Michael J. Freed, Michael B. Hyman, Ellyn M. Lansing, Much, Shelist, Freed, Denenberg & Ament, Chicago, IL, Patricia M. Hynes (argued), Deborah Clark–Weintraub, Kenneth J. Vianale, Milberg Weiss, Bershad, Hynes & Lerach, New York City, Marvin A. Miller, Patrick E. Cafferty, Kenneth A. Wexler, Miller, Faucher, Cherlow, Cafferty & Wexler, Chicago, IL, Arthur N. Abbey, Judith L. Spanier, Abbey & Ellis, New York City, Michael D. Craig, Schiffrin & Craig, Buffalo Grove, IL, for Herbert Eisenstadt, Joseph Meyer, Harvey Myer and Paul Schmergel in No. 96–3028.

Susan Getzendanner, Matthew R. Kipp (argued), Christina M. Tchen, Skadden, Arps, Slate, Meagher & Flom (Illinois), Chicago, IL, for John P. Frazee, Jr. and J. Stephen Vanderwoude in No. 96–2870.

Susan Getzendanner, Matthew R. Kipp (argued), Christina M. Tchen, Skadden, Arps, Slate, Meagher & Flom (Illinois), Chicago, IL, for Centel Corporation, John P. Frazee, Jr. and J. Stephen Vanderwoude in No. 96–3028.

Before POSNER, Chief Judge, and FLAUM and EVANS, Circuit Judges.

POSNER, Chief Judge.

The plaintiffs in this class action under sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and the SEC's Rule 10b–5, 17 C.F.R. § 240.10b–5, seek to recover the damages they claim to have suffered as a consequence of buying stock in Centel Corporation during a period in which, according to the complaint, the defendants (Centel and two of its officers) were exaggerating the prospects for a planned auction of the company. The district judge granted summary judgment for the defendants on the ground that there had been no actionable misrepresentations.

Centel comprised local telephone companies and cellular phone systems. The cellular-phone business was hot, and the local-telephone business cool, and Centel's board believed that the combination was unlovely to investors and that the firm's assets would be worth more if the company were sold either as a unit (presumably to a telecommunications firm whose assets would make a good fit with Centel's assets) or in pieces. The disadvantage of a sale in pieces was that Centel might owe corporate income tax on the difference between the sale price of its assets and its basis in the assets, which was low, whereas a merger of the entire firm into another firm would avoid corporate income tax. See Boris I. Bittker & James S. Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶¶ 12.42[1], 12.62[2] (6th ed.1994); 1 Martin D. Ginsburg & Jack S. Levin, *Mergers, Acquisitions, and Buyouts: A Transactional Analysis of the Governing Tax, Legal, and Accounting Considerations* §§ 302, 603 (1997).

Rather than just seek out possible purchasers and negotiate privately with them, Centel decided to organize an auction at which bidders could bid on the whole company or on parts of it as they wished. The auction was intimated in a public announcement by Centel on January 23, 1992, that it had hired two prominent investment banks to "explore strategic alternatives to maximize shareholder value, including the possible sale of the company." On the day of the announcement, the price of Centel's shares rose from $37 to almost $48. Centel's investment bankers explored the possibility of a sale of part or all of the company to one or more of the seven Baby Bells or GTE, but all eight of these companies were noncommittal. Either despite or because of its failure to extract a quick commitment, Centel on February 17 confirmed its intention to conduct an auction, announcing that its board of directors had "decided to solicit proposals for the purchase of all or part of the company as a result of the indications of interest received since the

company's January 23 announcement." Two weeks later, on March 5, GTE announced that it would not participate in the auction. Although Centel responded by bravely claiming that "[w]e believe that this [GTE's statement] has no impact on our process [and w]e continue to move along," a week later it met with its investment bankers in private to consider the viability of a "survivor entity" consisting of those assets of Centel that would not fetch an attractive price at the auction. The conclusion (not publicly announced) of the participants in the meeting was that any such entity would "very clearly bear the taint of a nonsaleable telco property which has been aggressively (and publicly) marketed to 'the world.'"

The countdown to the auction continued. On March 25, Pacific Telesis, one of the Baby Bells and a potential bidder for Centel's Nevada properties, a major asset, announced that it wouldn't bid for them after all. Centel reacted with a public statement that "the bidding process continues to go very well" and "very smoothly." By this time, several other large potential purchasers had expressed a lack of interest as well, and Centel was beginning to suspect that it would receive fewer bids than it had expected. The price of its stock had drifted lower than its peak on January 23, but it was still above $40.

April 16 was the deadline for the submission of bids. As the day approached, Centel's investment bankers visited several potential purchasers in an effort to stimulate bids. On April 13, Centel's chief executive officer announced publicly that there was "widespread interest almost down to every [Centel telecommunications] exchange," and the next day the *Chicago Tribune* reported that "people involved in the auction of Centel Corp. said Monday [April 12] that as many as 35 to 40 parties have explored submitting bids for the Chicago company or its pieces by Thursday's deadline. An investment banker for Centel provided the number of parties that have conducted so called due-diligence reviews of the company's books."

We must pause here to explain the term "due-diligence reviews." "Due diligence" is used in the corporate context in two senses.

The first, which is irrelevant to this case, is as a defense to liability for a false registration statement. See 1 William E. Knepper & Dan A. Bailey, *Liability of Corporate Officers and Directors* § 13–4, p. 521 (5th ed.1993). The second sense of the term (which one encounters in a variety of legal contexts besides corporate law; see, e.g., *Clark v. Robert Young & Co.*, 5 U.S. (1 Cranch) 181, 192–93, 2 L.Ed. 74 (1803)) is simply the exercise of due care. *In re Integrated Resources, Inc.*, 3 F.3d 49, 51 (2d Cir.1993). Boards of directors have to be careful before committing themselves to major transactions, lest they be sued by disgruntled shareholders if the transaction is a bust. Right after announcing the auction, Centel had designated a room in which potential bidders could inspect confidential data concerning Centel's operations and finances. In order to be admitted to the data room, they had to sign an agreement promising not to use the data for any purpose other than formulating a bid. Visiting the data room was an appropriate step in conducting a due-diligence review of a contemplated purchase of some or all of Centel's assets. Whether it was a *necessary* step is another question. Centel was a publicly regulated company, so a great deal of information about it was available without a visit to the data room; its "books" were largely a matter of public record. A prospective purchaser might deem the incremental value of the data in the data room offset by the potential liability if he signed, and was later accused of violating, the confidentiality agreement. Signing the agreement might thus inhibit the signer's ability to compete with Centel, should Centel survive the auction.

We don't know exactly what the term "due-diligence reviews of the company's books" as it appeared in the *Tribune* article means, because the reporter who wrote the article was not deposed. What we do know is that only 16 firms visited the data room (and two of those announced before the interview with the *Tribune*'s reporter that they had lost interest in bidding), although at least two dozen had expressed a serious interest in submitting bids and perhaps a dozen others had expressed some interest, which would

bring the total number of firms that had explored the possibility of submitting a bid into the 35 to 40 range. Three of the Baby Bells were among the seriously interested.

The auction was held on April 16 as scheduled, but it was a bust. Only seven bids were submitted, none for the whole company. Although Centel kept mum, it accepted none of the bids. Instead it approached Sprint hat in hand and quickly negotiated a sale of the entire company to Sprint at a price equivalent to only $33.50 a share, which was $9 below the then-current market price and roughly 10 percent below the market price before the auction was first intimated. As soon as the deal with Sprint was announced, on May 27, 1992, the value of Centel's shares plummeted, from $42.50 a share to $32. The plaintiff class consists of investors who bought Centel stock between the formal announcement of the auction on February 17 and just before the announcement of the purchase of the company by Sprint. Some of these investors lost as much as $15 a share, almost a third of the price they had paid.

■■■ The ultimate issue is whether Centel made false representations about the progress of the auction and if so whether any of those representations were material, meaning that a reasonable investor would have considered them a reason to buy (or not sell, if he already owned) stock in Centel. See *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 108 S.Ct. at 983–84, 99 L.Ed.2d 194 (1988); *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir.1995); *Pommer v. Medtest Corp.*, 961 F.2d 620, 623 (7th Cir. 1992); *In re Time Warner Inc. Securities Litigation*, 9 F.3d 259, 267–68 (2d Cir.1993). The best candidate for a material misrepresentation is the one reported in the *Tribune* article, which the plaintiffs not implausibly interpret to mean that Centel was telling the investing public that 35 to 40 companies had visited the data room; this would indicate a very high level of interest because, as we said, visitors to the data room were only a subset of serious potential bidders. The article, however, is hearsay: an out-of-court statement offered to prove the truth of its contents—to prove, that is, that Centel or its investment bankers made the comments at-

tributed to them. And hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial, *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir.1996); *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 962 (4th Cir.1996); *Schwimmer v. Sony Corp. of America*, 637 F.2d 41, 45 n. 9 (2d Cir.1980), except that affidavits and depositions, which (especially affidavits) are not generally admissible at trial, are admissible in summary judgment proceedings to establish the truth of what is attested or deposed, Fed.R. Civ. P. 56(c), (e); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir.1994); *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267–68 (7th Cir.1994), provided, of course, that the affiant's or deponent's testimony would be admissible if he were testifying live. There is no similar dispensation for newspaper or magazine articles, which not being attested are considered less reliable than affidavits or depositions.

Some courts have, it is true, allowed letters, articles, and other unattested hearsay documents to be used as evidence in opposition to summary judgment, *Church of Scientology Flag Service Organization, Inc. v. City of Clearwater*, 2 F.3d 1514, 1530 and n. 11 (11th Cir.1993); *Pennington v. Vistron Corp.*, 876 F.2d 414, 426 n. 15 (5th Cir.1989)-provided some showing is made (or it is obvious) that they can be replaced by proper evidence at trial. *Pritchard v. Southern Co. Services*, 92 F.3d 1130, 1135, amended on rehearing on other grounds, 102 F.3d 1118 (11th Cir.1996); *Williams v. Borough of West Chester*, 891 F.2d 458, 465 n. 12 (3d Cir.1989); *Catrett v. Johns–Manville Sales Corp.*, 826 F.2d 33, 38 (D.C.Cir.1987); Edward J. Brunet, Martin H. Redish & Michael A. Reiter, *Summary Judgment: Federal Law and Practice* § 5.06, p. 120 (1994). An example would be a letter inadmissible only because the signature on it had not been verified and there was no doubt that it could and would be. Any broader dispensation to disregard the rules of evidence in summary judgment proceedings would make it impossible ever to grant summary judgment, and, as pointed out by Brunet *et al., id.* at 119, is not supported by the Supreme Court's statement in *Celotex Corp. v. Catrett*, 477 U.S.

317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), that a party opposing summary judgment need not do so with evidence that is in a form that would make it admissible at trial. In context, the reference is to affidavits and depositions. *Duplantis v. Shell Offshore, Inc.,* 948 F.2d 187, 191–92 (5th Cir.1991); *Canada v. Blain's Helicopters, Inc.,* 831 F.2d 920, 925 (9th Cir.1987).

■ There are many exceptions to the rule that makes hearsay evidence inadmissible at a trial; if none of them is applicable, the "evidence" submitted in opposition to summary judgment is likely to be pretty worthless. No doubt there should be an exception for the cases just mentioned in which it hasn't been feasible to obtain better evidence but it is reasonably clear that such evidence will be available at trial. That exception (possibly implicit in the Federal Rules of Evidence, as we are about to see, as well as in the case law) isn't applicable here. Although the plaintiffs' lawyer told us at argument that she had been unable to depose the *Tribune's* reporter because of the discovery deadline set by the district judge, this contention does not appear in her briefs and we treat it as waived.

■ In these circumstances, the article cannot be treated as if it were attested. It was therefore admissible in summary judgment proceedings only if it fit into one of the exceptions permitting the use of hearsay evidence at trial. The only exception claimed to be applicable is the catchall exception for cases in which the out-of-court declarant, though available to testify, is not called. This exception requires that the statement be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts" and have "circumstantial guarantees of trustworthiness" equivalent to those of the enumerated exceptions. Fed.R.Evid. 803(24). Neither condition is met, the first because the plaintiffs could easily have obtained the reporter's affidavit even if it was for some reason infeasible to depose him.

The problem concerning satisfaction of the second condition is not so much doubt as to whether the reporter was telling the truth—he had no motive to lie—but uncertainty about what he meant in the passage that we quoted. He could have meant that Centel had told him that 35 to 40 firms had expressed interest in bidding; but this was true, as we have seen. The *intensity* of their interest is another matter, but would be difficult to gauge in advance, so "interest" cannot reasonably be interpreted as *greatly* interested. Prospective buyers do not go out of their way to trumpet interest in the property that they want to buy, lest they induce the seller to raise his price or, in the case of an auction, induce other bidders to raise their bids because they think that the property is worth more than they thought or that they must in any event pay more to get it because they're competing with someone who sets a very high value on it. To avoid jacking up the bidding in this way, prospective bidders will want to avoid seeming too eager. So it is entirely reasonable for the seller to think that there are more really interested bidders than have actually indicated a determination to bid.

Alternatively, the reporter may well have meant that Centel had told him that 35 to 40 firms had visited the data room. This would be false, since only 16 had done so. Would it have been a *material* falsehood? We do not know what investors would have assumed if Centel had kept mum throughout the entire process; and number of potential bidders is an inherently ambiguous indicator of the likely outcome of an auction—a large number of potential bidders could mean that Centel was expected to sell off its properties at bargain-basement prices; a lion's carcass will attract a lot of hyenas. We need not decide. We may assume that the precise number of visitors to the data room *would* have been material to investors. But it is unclear from the grammar of the quoted passage whether "the number of parties that have conducted so-called due-diligence reviews of the company's books" is the same number as the number of parties (35 to 40) who had "explored submitting bids." One wouldn't think exploration a synonym for due diligence, but who knows? The number of explorers (35 to 40) appears in the sentence just before the sentence discussing due-diligence reviews, and the second

sentence could be understood to be an elaboration of the first.

We cannot even be certain, though it seems likely, that the reporter meant by "due-diligence reviews of the company's books" visits to the data room. Centel or its investment bankers may have told him the number of potential bidders *and* mentioned that a number of firms had reviewed data in the data room, but without specifying that number, and the reporter—or an editor at the *Tribune*—may have conflated the two classes of potential bidder. For that matter it is possible that the reporter didn't *intend* to conflate them, but merely wrote clumsily or was edited clumsily. The record contains no information about the editing process at the *Tribune* or the reporter's sophistication in financial reporting.

We acknowledge the possibility that even if statements by Centel or its investment bankers were garbled by the press, Centel would not be privileged to sit by and allow investors to be misled by the garble. While it is true, as we shall see, that in this circuit, and maybe now in all circuits (as a result of the recent amendments to the securities laws), there is no duty to correct a prediction falsified by subsequent events, it needn't follow that a corporation or its advisors can as it were "adopt" a misleading press account of an interview that *they* gave, in order to influence the markets. (Obviously a corporation has no duty to correct rumors planted by third parties. *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 949 (2d Cir.1969) (Friendly, J.); see also *In re Time Warner Inc. Securities Litigation, supra*, 9 F.3d at 265; *State Teachers Retirement Board v. Fluor Corp.*, 654 F.2d 843, 850 (2d Cir.1981). The rumor might be planted by the target of a hostile takeover and be designed to elicit, if there is a legal duty to correct inaccurate rumors, a premature disclosure of the takeover firm's intentions.) But we need not decide this; it is not argued by the plaintiffs; their argument is that the *Tribune* article was an accurate report of what Centel's investment banker told the writer of the article, and this we simply cannot know because of the plaintiffs' failure to authenticate it.

■ Issues of the admissibility of evidence are for the district judge to resolve in the first instance, subject to the light appellate touch signified by the "abuse of discretion" formula. E.g., *Whitted v. General Motors Corp.*, 58 F.3d 1200, 1204 (7th Cir.1995); *Cavallo v. Star Enterprise*, 100 F.3d 1150, 1153–54 (4th Cir.1996); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1315 (9th Cir.1995). The district judge discussed the *Tribune* article as a source of possible misrepresentation, which means he didn't exclude it from evidence. But because he didn't discuss the question of admissibility, though it had been raised, we cannot be certain that he even considered it. He didn't think he had to consider it, because he believed that even if Centel had lied about the number of visitors to the data room, this was not a *material* misrepresentation.

■ When the district judge has not addressed the admissibility of possibly critical evidence in summary judgment proceedings, the appellate court must decide whether the judge would have abused his discretion had he admitted it. If the judge would have abused his discretion to admit the evidence, then of course the appellate court will not consider it in deciding whether to uphold summary judgment. If the judge would not have abused his discretion to admit the evidence, then the appellate court will consider it and if, with it considered, there is enough evidence to defeat summary judgment, the appellate court will vacate the grant of summary judgment to give the judge a chance to exercise his discretion. If on remand the judge decides to exclude the evidence in the proper exercise of his discretion, and the evidence was crucial to the appellate court's determination that summary judgment should not have been granted, the district judge should reinstate the summary judgment. *Id.* at 1315. For his action on remand in properly excluding the evidence would have eliminated the evidentiary basis for a denial of summary judgment.

■ We are more certain that the *Tribune* article is inadmissible—that a district judge would be abusing his discretion to admit it and thus that it is not available in opposition

to summary judgment for the defendants—than that the representation—if that is what it was—that 35 to 40 firms had visited the data room, when only 16 had done so, was not material. It would be an abuse of discretion to admit the article as evidence because of the doubt about what it means and about whether it is an accurate report of what Centel said and because the author was available to be deposed, or give an affidavit, and clear up these questions. So we set the article to one side and consider the other representations on which the suit is based. They amount to repeated claims that the auction process was going well, implying that lots of firms were interested in making attractive bids. These would not have had to be bids that when aggregated across the company's different assets (assuming that no one submitted an attractive bid for the whole company) would have yielded a price for the company in the range, roughly $41 to $46, at which its stock traded during the period between the announcement of the auction on February 17 and the announcement of the sale to Sprint on May 27. Those were prices far above the price of Centel's shares before the auction was announced. An auction that yielded a price for Centel's assets that exceeded the market value of the company before the auction process began would be a good auction—better than doing nothing—albeit not so good as the stock market might have hoped and expected. The auction failed, but the ensuing sale to Sprint yielded a price equal to roughly 90 percent of the market value of Centel before the auction process began.

We doubt that nonspecific representations that an auction process is going well or going smoothly could, in the circumstances of this case (the significance of this qualification will become clear shortly), influence a reasonable investor to pay more for a stock than he otherwise would. *Everybody* knows that someone trying to sell something is going to look and talk on the bright side. You don't sell a product by bad mouthing it. And everybody knows that auctions can be disappointing. It would be unreasonable for investors to attach significance to *general* expressions of satisfaction with the progress of the seller's efforts to sell, just as it would be unreasonable for them to infer from a potential bidder's apparent lack of enthusiasm that the bidder was uninterested rather than just was jockeying for a better price. The heart of a reasonable investor does not begin to flutter when a firm announces that some project or process is proceeding smoothly, and so the announcement will not drive up the price of the firm's shares to an unsustainable level—

Unless (the qualification we alluded to) the announcement is concealing a disaster. Suppose that on February 18 Centel's lawyers had told Centel that it couldn't legally sell any of its assets because they were encumbered and the lienors would not give their consent to a sale. In these circumstances to have announced that the auction process was going smoothly would have been materially deceptive. "Going smoothly" may mean nothing more than—going; but it means at least that; if the process has been stopped, a representation that it is continuing may well induce purchases of the stock at a price that reflects the prospect that the process will continue to its end.

It would not be a defense in such a case that it was in the interest of the investors as a whole, though contrary to the interest of the hapless investors who bought as a result of the concealment, to drum up interest in the sale by whatever means, in the hope that some sucker would buy. All that that would mean is that the winners from the fraud would outnumber the losers *among the seller's investors*. There would be another set of losers, the owners of the deceived buyer. The cases do not try to net out the gains from fraud in deciding how much if any damages to award the victims of the fraud. The losers get back what they lost; most of the winners get to keep what they gained (anyone who bought stock in Centel on January 22 and sold it on or before May 26 was a winner); no effort is made to compute the net social cost. See, e.g., *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 203 n. 25 (3d Cir.1990); *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1437 (9th Cir.1987); Donald C. Langevoort, "Capping Damages for Open–Market Securities Fraud," 38 *Ariz. L.Rev.* 639, 640 n. 4 (1996). Maybe the effort

should be made, see, e.g., *Ackerman v. Schwartz*, 947 F.2d 841, 846–47 (7th Cir. 1991), but that is hardly an issue we need pursue here. Centel was not, by its talk of smooth sailing, covering up a disaster, whether to protect its investors as a group at the expense of investors in an acquiring firm or to achieve some other objective. The auction process was not interrupted. The results were disappointing, but that is a frequent outcome of auctions; they involve a high degree of uncertainty because there has been no previous negotiation between buyer and seller. That is no doubt why Centel did not commit itself to accept the highest bids, however low, for the various properties on the auction block. There were bumps in the road to the auction, as when GTE and then Pacific Telesis bowed out. Yet "bowed out" is not quite the right term. No one knew until the auction was held who would bid. GTE and Pacific Telesis might have bowed out strategically only to reappear at the last moment, hoping that their earlier expressions of a lack of interest would have depressed the bids of other potential purchasers.

█ Procedurally, the auction process went as smoothly as could be desired; no legal or other glitches derailed it. Substantively, the process did not generate as much interest as Centel would have liked—but how much interest is that? The company was sold to Sprint for $4 billion. Centel would have been delighted if the auction had yielded $8 billion. Even if it had made a public prediction of such a result, it would have had no legal duty, in this circuit anyway and perhaps in no circuit after the Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67, § 102(b), 109 Stat. 737, 755 (codified at 15 U.S.C. § 78u–5(d)), to make a public revision of the prediction when it became clear that no such bonanza was in the offing. *Grassi v. Information Resources, Inc.*, 63 F.3d 596, 599 (7th Cir.1995); *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331–32 (7th Cir.1995). It made no prediction. It never even predicted that there would be a purchaser for the whole caboodle. The plaintiffs' briefs actually emphasize (presumably because they don't want to get tripped up by *Grassi* and *Stransky*) that this is not a case about predictions. Centel's chief executive officer stated repeatedly to the investment community that he did not know how many bids would be received. He even stated that the auction might not obtain adequate value for the shareholders, in which event the company would explore other possibilities, of which the "survivor entity" was one and sale outside the auction process another.

█ An utterly candid statement of the company's hopes and fears, with emphasis on the fears, might well have pushed the company's stock below $40, but perhaps only because, given the expectation of puffing, such a statement would be taken to indicate that the prospects for the auction were much grimmer than they were. Where puffing is the order of the day, literal truth can be profoundly misleading, as senders and recipients of letters of recommendation well know. Mere sales puffery is not actionable under Rule 10b–5. *Searls v. Glasser, supra,* 64 F.3d at 1066; *Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1217–18 (1st Cir.1996); *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 811 (2d Cir.1996); *Raab v. General Physics Corp.,* 4 F.3d 286, 289 (4th Cir.1993).

Centel cannot be faulted for having failed to tell the stock market that there would be only seven bidders and their bids would be no good. Had it known this from the start it wouldn't have announced an auction. Hindsight is not the test for securities fraud. *Pommer v. Medtest Corp., supra,* 961 F.2d at 625; *DiLeo v. Ernst & Young,* 901 F.2d 624, 628 (7th Cir.1990); *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., supra,* 75 F.3d at 812; *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978) (Friendly, J.). The question is whether Centel said things that were so discordant with reality that they would induce a reasonable investor to buy the stock at a higher price than it was worth ex ante. The answer, if we limit our consideration to the admissible evidence, as we must, is no. Centel put a rosy face on an inherently uncertain process; investors would have expected no less; the

price they paid for the stock during the complaint period was reasonable at the time they bought; *only* in hindsight could it be said that they had made a mistake. So clear is this on the basis of the undisputed admissible evidence that summary judgment was properly granted for the defendants.

AFFIRMED.

FLAUM, Circuit Judge, concurring.

While I agree that the *Chicago Tribune* article is inadmissible hearsay for the reasons stated in the majority opinion and therefore join the decision, I write separately to express my concern with the potential ramifications of the alleged corporate conduct in this case. The court accepts that even if the representation as to the number of companies who had conducted due-diligence reviews of Centel's books was materially misleading—and I believe that it was— no liability can result in this case. Left open is the question of whether a corporation has a duty to monitor the accuracy with which its oral statements are reported by the media. In my judgment, this is an area of inquiry warranting examination.

As Congress recognized in passing the Exchange Act, "[t]here cannot be honest markets without honest publicity." *See Basic Inc. v. Levinson,* 485 U.S. 224, 230, 108 S.Ct. 978, 982, 99 L.Ed.2d 194 (1988) (quoting H.R.Rep. No. 1383, 73d Cong., 2d Sess. 11 (1934)). Some of the burden of ensuring the honesty of a company's publicity is properly placed on the company. In the instant case, it would appear that Centel, at the very least, made vague, possibly even confusing, oral representations to the press concerning the state of the bidding process. In order to convey the desired impression that interest in the company was widespread, the company's spokespersons would have had to walk a very thin line. Given that Centel had begun to suspect that it would not receive a large number of bids,[1] any statement beyond a vague reassurance that many companies had expressed some level of interest would run the risk of misleading investors. In this situation, the decision to make oral, extempo-

raneous comments, which were likely to be taken out of context or paraphrased, was an imprudent one that the law should not rush to insulate. While the majority recognizes the possibility that Centel may have had an independent duty to correct any materially misleading statements under these circumstances, it reserves the question since it is not directly before the court. However, due to the potential significance of the issue to future litigation, I believe the general rule that a corporation has no duty to correct misstatements attributed to it by the press is deserving of reexamination in the context of this case.

As the majority notes, underlying the general rule that a corporation has no duty to correct misinformation reported in the press that is not attributable to the corporation is the concern that persons outside a corporation, by planting misinformation in the press, could force the corporation to disclose prematurely information it would otherwise choose to keep secret, thereby foisting on the corporation a duty to correct the statement. *See Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 949 (2d Cir. 1969) (recognizing that misleading news report may have been effort by target company to obtain information regarding possible tender offer prior to time required by Exchange Act); *see also In re Time Warner Inc. Securities Litig.,* 9 F.3d 259, 265 (2d Cir.1993) (holding that dismissal under FRCP 9(b) was proper when complaint failed to allege source of unattributed statements); *State Teachers Retirement Bd. v. Fluor Corp.,* 654 F.2d 843, 850 (2d Cir.1981) (stating that corporation has no duty to correct rumors in marketplace unless rumors can be attributed to corporation). This rule recognizes that there are often valid reasons a corporation would choose not to disclose certain information, such as in the context of pending merger negotiations. *See In re Time Warner,* 9 F.3d at 267 ("[A] corporation is not under a duty to disclose a fact merely because a reasonable investor would very much like to know that fact."); *Flamm v. Eberstadt,* 814 F.2d 1169, 1177 (7th Cir.1987) (recognizing that

---

1. Frazee himself admitted that, by the latter part of March, he "began to suspect ... that maybe

[the company] wouldn't get as many bids as we thought we were going to get...."

corporation's silence as to pending merger negotiations is beneficial to investors). This is a concern that is clearly not implicated in the present case. While a corporation has an interest in the timing of its disclosures, it has far less interest in remaining silent with respect to matters on which it has already chosen to comment. Apparently, Centel's Chairman and its investment banker voluntarily commented on the level of interest in the company's assets and they were undoubtedly aware that they might be quoted as having done so. It is therefore appropriate to ask whether Centel should bear some responsibility for the accuracy of the reported statements, which stemmed from its publicity efforts and which were attributed to named corporate insiders, not anonymous sources.

A factor weighing in favor of holding Centel accountable for the misinformation is that Centel chose the means by which it would convey information to the public. Companies speak to the public in a variety of ways: issuing press releases, holding press conferences, and granting interviews to analysts or member of the press, to name a few. Some of these methods are more likely than others to ensure that a corporation's statements are accurately reported by the media. What makes the instant case difficult is that it is unclear whether the *Tribune*'s story is in fact an accurate account of Frazee's and Paulson's statements. This type of ambiguity is most likely to arise in those cases in which corporate officers and agents make oral, extemporaneous statements in response to questions posed by the press. Because corporations and their attorneys are well aware that speaking to the press entails some risk that the company's statements may be misquoted or taken out of context, corporations often wisely choose to speak through prepared press releases or to have company spokespersons read prepared statements that have been reviewed by the company's attorneys. These methods of communication reduce the likelihood that there will be confusion as to what has been said and enable corporations to control the exact content of their disclosures. Because corporations that avail themselves of forms of publicity devoid of similar safeguards share some degree of responsibility for the accuracy of what is subsequently reported, it is appropriate to ask whether these corporations should bear the concomitant duty to correct any materially misleading information attributed to them. *See* John M. Sheffey, *Securities Law Responsibilities of Issuers to Respond to Rumors and Other Publicity: Reexamination of a Continuing Problem,* 57 NOTRE DAME LAW. 755, 784 (1982) (arguing that oral and extemporaneous nature of interviews make it likely that company is contributing cause to inaccurate report and suggesting duty to correct is therefore appropriate).

Admittedly, any rule that imposes on corporations the duty to correct information attributed to them would cause corporations to be more cautious in dealing with the press. However, encouraging corporations to speak with precision when making oral statements to the press is hardly an undesirable result. As the majority recognizes, in the instant case we do not know what Frazee and Paulson told the *Tribune* concerning the number of corporations that expressed interest in bidding on Centel and what form these indications of interest took. It seems likely that certain phrases, *e.g.* "due diligence," "exploring submitting bids," as well as certain numbers, "35 to 40," were used. What is clear is that the article implies that the number "35 to 40" was the number confirmed by Centel's Chairman as the number of companies that conducted due diligence review of Centel's books.[2] A rule that does not require a corpo-

---

2. I agree with plaintiffs that a fair reading of the article suggests that 35 to 40 was the number provided by Centel's investment banker of the firms that had conducted due diligence reviews of the company's books. Given that the number "35 to 40" is the only number mentioned in the article, the reporter's reference in the second sentence to "the number" would logically be understood to refer to the number "35 to 40" mentioned in the preceding sentence. Defen-

dants, in their brief, admit that the article "suggests that this number of companies had conducted due diligence."

Additionally, I do not believe that a reasonable investor would understand the number of parties who had conducted "due-diligence reviews of the company's books" to include those companies who had done nothing more than examine the information about Centel that was available as a matter of public record. While I agree with the

ration to correct misleading statements that are to the corporation's benefit creates an incentive for corporations to be vague in responding to inquiries by the press. For example, in the instant case, Centel was less than optimistic about the quantity of bids it would receive. Nevertheless, it was in Centel's interest to convey the opposite impression—that it was a desirable company with many suitors—in the hopes of drumming up last-minute interest. One way to do this would be to throw out some high numbers, but to be vague as to what those numbers refer to. Paulson's deposition testimony states that while he does not deny having given the number "35 to 40," he cannot remember to what class of bidders he would have attached that number, and it does not appear that he had tallied this number in advance of the interview.[3]

The significance of the information imparted by the *Tribune* article only exacerbates my unease. Unlike the majority, I harbor little doubt as to the materiality of the statement at issue here, which included a concrete estimate of the number of potential bidders who had conducted "due-diligence reviews of the company's books." The exact wording of this statement is relevant: determinations of materiality depend on a "delicate assessment of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him...." *See TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976). The inferences an investor would draw from the "35 to 40" statement are different than the inferences an investor would draw from the statement that a potential bidder "expressed interest" in the compa-

ny or that it "had explored submitting a bid." Statements that a company has "expressed interest" or "explored submitting a bid" tell the investor nothing about the extent of the acquiring company's interest or how deeply it has explored submitting a bid. The instant case therefore provides a good example of why corporations should speak with specificity and choose their words carefully when providing factual information to the press.

An investor would understand conducting a due-diligence review of a target's books to be a significant indication of interest, because, in order to have received access to Centel's non-public information, a bidder would have had to sign a "confidentiality statement." Such a commitment, in the words of Centel's Chairman, was a "pain": bidders had to agree to not use the information for any purpose other than submitting a bid, not to trade Centel's stock for a certain period of time, and not to discuss the transaction with any other bidders. The willingness or unwillingness of a company to sign the confidentiality agreement was therefore some indication of where a potential bidder was in its decision process. As the majority correctly notes, there was a substantial amount of information available about Centel as a matter of public record from which a potential bidder could make an assessment of Centel's attractiveness as a target. Because signing the confidentiality agreement was not without its own costs, it is unlikely that a company would sign the agreement unless its initial review of the publicly available information suggested that Centel might be a desirable target. The opposite is also true: an investor whose initial assessment was unfavorable would put a lower value on obtain-

majority that the term due diligence is an amorphous concept, this is not to say that the term is without meaning in a given context. In the instant case, Centel placed itself on the auction block and opened its books to potential bidders. "Due diligence" in this context would therefore likely involve a review of these materials, in contrast to "due diligence" in connection with an unsolicited offer to acquire a company, which necessarily would be limited to a review of information in the public domain. The exercise of due care in the instant case would likely include some examination of Centel's internal records to ensure that its public financial statements were an accurate reflection of its true earnings and assets and that there were no undisclosed liabilities lurking beneath the publicly available num-

bers. The majority acknowledges that this would be an "appropriate step" in conducting a due diligence review. In any event, even if the term "due diligence" could be understood to include an examination limited to the information available in the public domain, the modifier "of the company's books" belies the reasonableness of such an interpretation in this case.

**3.** In addition, Cody Smith, a partner at Goldman Sachs, testified that he spoke with Paulson after the article came out and that Paulson said that the number of parties who might bid was something that he would have liked to ask Smith before the interview.

ing additional information. In the context of a closed-bid auction, these actions would have spoken louder than the bidders' words, which were unlikely to reveal much about their true intentions.[4]

What investors would have taken from the *Tribune* article then is not that many companies had expressed some interest in bidding, but that thirty-five to forty companies were *actively pursuing* the possibility of placing a bid for Centel's assets. Although it is not clear from the record, it may very well be that this number represents a significant percentage of the total class of potential purchasers. One would assume that the list of telecommunications companies with a need for Centel's assets and the resources to purchase them is not a long one. The reality, of course, was much different. As of April 14, 1992, twenty-three companies had signed confidentiality agreements, only nineteen of which had acted on the agreement and obtained any information from Centel,[5] and at least two of these had publicly announced that they would not bid. While it is at least possible, as the majority observes, that a company would place a bid without having undertaken some review of Centel's books, the point is that a company would be far less likely to do. The facts of this case illustrate this point: all seven of the bids received by Centel were made by companies that had signed confidentiality agreements and received some confidential information from the company. It may be true that a large number of bids does not guarantee an auction's success, but a lack of interested bidders hardly bodes well. This is especially true given that it had become clear that it was unlikely Centel would be sold in its entirety; what the company was counting on (by its own admission) was "widespread in-

terest" in the "various pieces" of the company. The fact that nineteen companies at most, not "35 to 40," were actively considering bidding is a fact that would have been viewed by investors as significantly altering the mix of available information.

In short, I would not hesitate to conclude, had it been established by the plaintiffs that Centel's officials directly made the statements attributed to them, that such statements could be actionable under Rule 10b–5. Given the capacity of statements attributed to named corporate insiders to mislead investors, it is also worth considering whether, under certain limited circumstances, the securities laws impose a duty to correct any materially misleading statements so attributed, even in the absence of proof as to whether the attributed statements were actually made. Of course, further exploration of this issue must await another day and case.

4. Frazee's own testimony indicates that he considered the signing of a confidentiality agreement to be a significant indication of interest. In his deposition testimony before the SEC, Frazee states:

> If you can get somebody to sign one of these things, you know they're really interested in doing it because it's a pain ... [Y]ou have to agree not to disclose anything. You have to agree not to trade the stock for ... two years.... And we also had a provision in our confidentiality agreement that they couldn't team up and bid, you know.

Paul Taubman, one of Centel's investment bankers likewise testified:

> If somebody says, I want lots of information, and how can I start due diligence, they're still not giving you a value, but on [a] continuum, they're going to be more likely to be interested.

5. The majority correctly notes that the company's records suggest that sixteen companies visited the data room. In addition, the log kept by the Centel employee in charge of the data room suggests that materials were provided to nineteen companies.