**In re HIGH FRUCTOSE CORN SYRUP ANTITRUST LITIGATION.**

**This Document Relates to All Actions.**

**MDL No. 1087.
No. 95–1477.**

United States District Court, C.D. Illinois.

Nov. 25, 2003.

---

Michael J. Freed, Much, Shelist, Freed, Denenberg, Ament, Bell & Rubenstein, P.C., Chicago, IL, Robert N. Kaplan, Kaplan, Kilsheimer & Fox, LLP, New York, NY, H. Laddie Montague, Jr., Berger & Montague, P.C., Philadelphia, PA, for Class Plaintiffs.

Brian Posewitz, Tonkon Torp, LLP, Portland, OR, for Plaintiff, Gray & Co.

Mark W. Ryan, Richard J. Favretto, Mayer, Brown & Platt, Washington, D.C., for Defendant, Cargill, Inc.

Aubrey M. Daniel, III, Steven R. Kuney, Williams & Connolly, Washington, D.C., for Defendant, Archer Daniels Midland Co.

Terry M. Grimm, Joseph Spiegler, Winston & Strawn, Chicago, IL, for Defendant, A.E. Staley Manufacturing Co.

Donald R. Harris, Edward F. Malone, Jenner & Block, LLC, Chicago, IL, for Defendant, American Maize–Products Co.

## ORDER

MIHM, District Judge.

On November 17–21, 2003, the Court held an in person hearing on the various motions in limine pending in this case. Numerous rulings were made orally and are reflected in the daily minutes from that hearing. This Order adopts and in some instances supplements the Court's oral rulings with respect to three discrete issues presented during the hearing: (1) the preclusive effect of the Seventh Circuit's opinion in *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651 (7th Cir.2002), on the evidentiary objections presented in the motions in limine; (2) ADM's Motion to Compel the Testimony of Michael Andreas and Terry Wilson; and (3) the Non–ADM Defendants' Motion for Severance. Each will be addressed in turn.

### I. *Preclusive Effect of Appellate Opinion*

There is some dispute among the parties to this litigation as to the extent to which the Seventh Circuit's opinion reversing this Court's grant of summary judgment in favor of Defendants precludes this Court from considering many of the evidentiary objections presented in the pending motions. Plaintiffs seize upon Judge Posner's use of the phrase "admissible evidence" and assert that the Court of Appeals necessarily precluded the consideration of various unmade or unconsidered evidentiary objections and found that certain pieces of evidence were necessarily admissible against all Defendants. Defendants, on the other hand, point to wording indicating that the panel construed the evidence in as favorable a light to the plaintiffs as the record permitted to support their contention that the Court retains the power to consider evidentiary objections in the first instance under the principles set forth in

*Eisenstadt v. Centel Corp.*, 113 F.3d 738, 744 (7th Cir.1997). The parties' dispute is not surprising, as ambiguous wording in the opinion reasonably permits the alternative positions. This is unfortunate, because with the addition of just a few more words, the Court of Appeals could easily have clarified the result it intended. As it did not, the Court must parse the language of the opinion and construe it in the light of existing case law to resolve the dispute.

The "law of the case" is a rule of practice under which "a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in successive stages of the same litigation." *Roboserve, Inc. v. Kato Kagaku Co., Ltd.*, 121 F.3d 1027, 1031 (7th Cir.1997). The doctrine "governs the weight that interim rulings in a litigation are given in the subsequent stages of that litigation." *Id., citing Amcast Industrial Corp.v. Detrex Corp.*, 45 F.3d 155, 157 (7th Cir.1995). A court will ordinarily not reconsider its own decision made at an earlier stage of the trial or on a prior appeal, absent clear and convincing reasons to reexamine the prior ruling. *Johnson v. Burken*, 930 F.2d 1202, 1207 (7th Cir.1991).

■ "If a final judgment had been entered, the case appealed, the judgment reversed, and the case remanded, the trial judge would be required to adhere on remand to the rulings that he had made before the case was first appealed, provided of course that they had not been set aside by the appellate court. Even more clearly would he be required—this is the most elementary application of the doctrine of law of the case—to comply with the rulings of the appellate court." *Id., citing Williams v. Commissioner of Internal Revenue*, 1 F.3d 502, 503 (7th Cir. 1993). "[O]nce an appellate court either expressly or by necessary implication decides an issue, the decision will be binding upon all subsequent proceedings in the

same case." *Id., citing Key v. Sullivan*, 925 F.2d 1056, 1060 (7th Cir.1991). "Law of the case is limited insofar as it applies only to issues that were decided in the former proceeding but not to questions which might have been decided but were not." *Id.* at 1032.

■ That being said, it is well-established that issues of the admissibility of evidence are for the district court to resolve in the first instance; it is not the proper role of the appellate court to decide issues of admissibility not previously addressed by the district court. *Eisenstadt*, 113 F.3d at 744; *Crivens v. Roth*, 172 F.3d 991, 999 (7th Cir.1999). When the district judge has not addressed the admissibility of possibly critical evidence in summary judgment proceedings, the appellate court reviews the evidence, not to determine its admissibility, but rather to determine whether the district judge would have abused his discretion had he admitted it. *Eisenstadt*, 113 F.3d at 744.

If the judge would have abused his discretion to admit the evidence then of course the appellate court will not consider it in deciding whether to uphold summary judgment. If the judge would not have abused his discretion to admit the evidence, then the appellate court will consider it and if, with it considered, there is enough evidence to defeat summary judgment the appellate court will vacate the grant of summary judgment to give the judge a chance to exercise his discretion. If on remand the judge decides to exclude the evidence in the proper exercise of his discretion, and the evidence was crucial to the appellate court's determination that summary judgment should not have been granted, the district judge should reinstate the summary judgment.

*Id.*

■ Here, this Court was presented with and made only three express eviden-

tiary rulings on summary judgment. The Court held: (1) the blanket exclusion of the Department of Justice tapes sought by the Defendants was not appropriate; (2) the FBI 302 reports were inadmissible; and (3) Andreas and Wilson's Fifth Amendment invocations could not be imputed to any Defendant. The litany of specific objections now before the Court simply were not presented either on summary judgment or on appeal to the Seventh Circuit. Thus, the suggestion that the Court of Appeals abandoned the well-established practice of having issues of admissibility first addressed by the district court and, in doing so, conclusively overruled by implication hundreds of evidentiary objections that were not before it when it generically referred to Plaintiffs' ability to present some "admissible" evidence must be rejected. Rather, the only conclusion that the Court can reach without ignoring the well-established law of this circuit is that the panel construed the record in the light most favorable to Plaintiffs, as must be done on summary judgment, and found that based on this favorable construction, the district court would not have abused its discretion in admitting such evidence for purposes of considering the motion for summary judgment. This is a classic *Eisenstadt* situation.

■ That being said, the Court of Appeals did make four express evidentiary rulings that this Court considers to be binding. On pages 660–61 of the opinion, the Seventh Circuit declined to reconsider this Court's refusal to exclude Defendants' expert reports under *Daubert*. On page 662, the Court of Appeals found a comment by one of Staley's HFCS plant managers that, "We have an understanding within the industry not to undercut each other's prices" to be admissible as an admission by a party under 801(d)(2)(D). On page 664, the Seventh Circuit held that Andreas and Wilson's Fifth Amendment invocations and any inferences therefrom

were admissible against ADM to show that there was a conspiracy and that ADM was part of it; the Seventh Circuit also held that Andreas and Wilson's Fifth Amendment invocations were not admissible against the non-ADM Defendants despite the coconspirator exception to the hearsay rule under 801(d)(2)(E).

■ There is one other express ruling that the Court believes must be considered separately from the previous holdings. On page 664, the Court of Appeals found that, "[S]ince evidence of [ADM's] past crimes, or of other bad acts committed in the past, is inadmissible to prove that the defendant probably is guilty of whatever he is now being charged with ... ADM's previous misconduct cannot be used as evidence that it participated in a conspiracy to fix the price of HFCS" or to show that because the Justice Department has not moved against the alleged HFCS price-fixing conspiracy, there must not have been one. While this seems to be clear and unambiguous wording, the surrounding text indicates that the Court of Appeals did in fact consider such evidence for other purposes consistent with Rule 404(b). Thus, the Court does not find that particular wording to be preclusive in terms of the use of that evidence against ADM for any purpose.

That is the extent of the rulings that this Court finds were made either expressly or by necessary implication. Accordingly, the Court must conclude that it retains its traditional power to consider all other evidentiary objections in the first instance.

## II. *Motion to Compel Testimony*

Former ADM executives Michael Andreas ("Andreas") and Terry Wilson ("Wilson") were deposed in connection with this case on three different occasions: January 1997 (which was prior to their convictions), June 1998 (which was during the pendency

of their criminal proceedings), and February 2001 (after their convictions were upheld on appeal). Both of them answered nothing other than their names before invoking the Fifth Amendment in response to all substantive questions.

ADM has now moved to compel the testimony of Andreas and Wilson. Both witnesses are within the subpoena power of this Court but have informed ADM through counsel that if called to testify at trial, they intend to continue to assert their Fifth Amendment privilege. Andreas and Wilson were convicted of fixing prices in the lysine market on September 17, 1998. On June 26, 2000, their appeals were denied, and they were resentenced on September 22, 2000. A Petition for Writ of Certiorari was denied on November 22, 2000. Both Andreas and Wilson have now served the entirety of their sentences and been released from prison. While ADM concedes that any testimony might be potentially incriminating because it would include the citric acid industry, ADM nevertheless contends that as the applicable statute of limitations for antitrust offenses is five years, and it is virtually undisputed that any fructose conspiracy ended on June 27, 1995, the expiration of the statute of limitations should serve as a bar to future prosecution. Given these circumstances, ADM argues that neither faces any realistic prospect of jeopardy arising from their anticipated testimony and cannot continue to validly invoke the privilege.

Wilson and Andreas respond that because there was never any prosecution or grant of immunity with respect to either citric acid or fructose, the possibility of future jeopardy is very real. They assert that conspiracy is a classic example of a continuing offense and cite to the possibility that conspiratorial activity continued even after the government investigation ended. Andreas and Wilson further argue

that their answers to questions could tend to incriminate them or provide a link in the chain of evidence leading to proof of violations, and may become the catalyst that triggers new government inquiries.

■ There is no absolute right to invoke the Fifth Amendment. "To be privileged by the Fifth Amendment to refuse to answer a question, the answer one would give if one did answer it (and answer it truthfully) must have some tendency to subject the person being asked the question to criminal liability." *In re HFCS*, 295 F.3d at 663–64. The Fifth Amendment privilege is only properly invoked if the witness establishes an objectively reasonable belief that a responsive answer could expose that individual to criminal prosecution.

■ The witness' say-so does not establish the likelihood of criminal prosecution for further jeopardy. *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). Once the witness asserts the privilege, "it is for the court to say whether [his] silence is justified, ... and to require [him] to answer if it clearly appears to the court that he is mistaken." *Id.* The trial judge is in the best position to consider whether a responsive answer to the question or an explanation of why it cannot be answered could be harmful to the witness under the particular factual circumstances. *Ryan v. Commissioner of Revenue*, 568 F.2d 531, 539 (7th Cir.1977). "If a court concludes, based on the circumstances of the case, that disclosure of testimony would not lead to a conviction that violates the Self–Incrimination Clause, then the court may force the witness to speak." *United States v. Gecas*, 120 F.3d 1419, 1429 (11th Cir.1997). In making this inquiry, the Court must consider: (1) whether answers to questions might tend to reveal participation in or otherwise establish a link to criminal activities; (2) if

not, the witness must answer; (3) if so, the court must still determine whether there is a risk that the witness will in fact be prosecuted for the potentially criminal activities about which he is asked to testify. *Id.* The right to assert the privilege depends on the witness establishing "a possibility of prosecution which is more than fanciful." *In re Folding Carton Antitrust Litigation,* 609 F.2d 867, 871 (7th Cir. 1979). The court should make its determination through the examination of more traditional tests, such as statute of limitations, immunity, or double jeopardy. *Id.* at 872. If there can be no further incrimination, there is no basis for the assertion of privilege. *Mitchell v. United States,* 526 U.S. 314, 326, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999).

■ Here, it is clear that Andreas and Wilson face no further jeopardy with respect to the lysine market, because they have already been convicted, sentenced, and have completed their appellate processes. *Mitchell,* 526 U.S. at 326, 119 S.Ct. 1307. The federal government has long since closed its criminal inquiry into the HFCS and citric acid markets. With respect to alleged antitrust violations of HFCS or any other product, any criminal prosecution would necessarily be barred by the applicable statutes of limitations, as Wilson went on leave status in 1995, resigned in 1996, and his independent consulting agreement terminated in October 1998. Similarly, Andreas was placed on unpaid leave of absence in 1996 and could not have had any involvement in any product made or sold by ADM within the last five years. These are important points, as the ability to influence the policies or practices of ADM as a corporate entity is essential to the viability of the inter-corporate price-fixing conspiracies alleged.

There is no evidence indicating that the conspiracies to which their testimony might establish a link did not end with the raid on ADM's Decatur headquarters on June 27, 1995. Although Andreas and Wilson make vague reference to the theoretical possibility that some overt act may have been taken in furtherance of the conspiracy within the limitations period, conclusory assertions of a continuing conspiracy are insufficient; they must prove that the conspiracy existed into the limitations period. *Fitzgerald v. Seamans,* 553 F.2d 220, 230 (D.C.Cir.1977). In this case, where the alleged conspiracies involved corporate manipulation of certain markets, the record is simply devoid of any evidence suggesting that any overt acts were completed after June 27, 1995, as would be required to bring Andreas and Wilson within the five year statute of limitations.

Moreover, even if the conspiracies somehow continued after the raid on ADM's headquarters, the cessation of Andreas and Wilson's employment with ADM in 1996, and the subsequent expiration of Wilson's independent consulting agreement on October 5, 1998, would have ended their ability to act on behalf of ADM as a practical matter, which gives rise to a rebuttable presumption that they effectively withdrew from any conspiracy. *See Morton's Market, Inc. v. Gustafson's Dairy, Inc.,* 198 F.3d 823, 839 (11th Cir. 1999) (finding that "in the context of a business conspiracy, one in which the conspiracy is carried out through the regular activities of an otherwise legitimate business enterprise, the law has given effect to a conspirator's abandonment of the conspiracy only where the conspirator can demonstrate that he retired from the business, severed all ties to the business, and deprived the remaining conspirator group of the services which he provided to the conspiracy"), *citing United States v. Lowell,* 649 F.2d 950, 955 (3rd Cir.1981); *United States v. Steele,* 685 F.2d 793 (3rd Cir.1982). Cases involving corporate conspiracies have routinely held that an em-

ployee's resignation or termination from the conspiring business constitutes an effective withdrawal absent the introduction of some evidence indicating continued participation or acquiescence in the goals of the conspiracy. *Morton's Market,* 198 F.3d at 839; *United States v. Nerlinger,* 862 F.2d 967, 974 (2nd Cir.1988); *United States v. Bullis,* 77 F.3d 1553, 1562–63 (7th Cir.1996). As there is no such evidence of continued participation or acquiescence by either Andreas or Wilson in this case, the Court must conclude that the presumption of withdrawal stands unrebutted, and that the cessation of their ongoing employment or agency relationships with ADM constituted an effective withdrawal from the alleged conspiracies no later than October 1998. Accordingly, the applicable statutes of limitation pursuant to which they could be prosecuted for antitrust violations would necessarily have run no later than October 2003.[1]

Where, as here, prosecution is clearly barred by the statute of limitations, the Court cannot find that the possibility of future prosecution is more than fanciful. The Court may therefore reject the invocation of the privilege and compel the witnesses to answer. *Brown v. Walker,* 161 U.S. 591, 598, 16 S.Ct. 644, 40 L.Ed. 819 (1896); *National Acceptance Co. v. Bathalter,* 705 F.2d 924, 927 n. 5 (7th Cir. 1983). Were this the end of the inquiry, the Court would have no hesitation in doing just that. In fact, the Court initially granted the Motion to Compel and set the process in motion for obtaining testimony from Wilson and Andreas, as well as any additional discovery that this process might necessitate. However, upon further reflection, the Court determined that it had not given sufficient consideration to the prejudice that would be suffered by the Plaintiffs if the motion were granted.

Plaintiffs articulated three bases for prejudice that they would suffer: (1) further delay in the resolution of a case that has already been pending for more than eight years (the Court's informed estimate is of an additional delay of 4–8 months in the scheduled trial date); (2) the burden of reopening discovery that has long since been completed in order to take full advantage of any testimony that Andreas and Wilson might give and the danger that memories may be so impaired by the substantial lapse of time that this entire process would yield no real fruit; and (3) the potential invalidation of a trial strategy and preparation that have been years in the making that could result from their testimony. After a more in-depth consideration of these factors, the Court concludes that while Andreas and Wilson can no longer validly invoke their Fifth Amendment privilege, the need for this testimony is outweighed by the likelihood of unfair prejudice to the Plaintiffs resulting from the first two bases enumerated above. The Court therefore reversed its ruling granting ADM's Motion to Compel and denied the motion.

### III. *Motion for Severance*

The non-ADM Defendants have filed a Motion for Severance pursuant to Rule 21 of the Federal Rules of Civil Procedure. Rule 21 provides in its entirety:

> Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court

---

1. During the hearing, counsel for Andreas made passing reference to the availability of a three-year extension of the statute of limitations under 18 U.S.C. § 3292 that can be requested by the Government where there is a need to obtain documents overseas. However, there is nothing in the record to indicate that this section is applicable to the facts of this case, particularly as the Department of Justice has advised that its grand jury investigations into the markets in question are closed.

on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately.

The non-ADM Defendants argue that severance is appropriate under the circumstances of this case because the prejudicial spillover effect that will result from the substantial amount of highly charged evidence designated by Plaintiffs that has been held to be admissible only against ADM will necessarily deprive them of a fair trial.

■ In considering a motion for severance, the Court must generally consider certain factors: (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims. *Morris v. Northrop Grumman Corp.*, 37 F.Supp.2d 556, 580 (E.D.N.Y.1999), *citing Hendrickson Bros., Inc. v. New York*, 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988).

Here, it is essentially undisputed that the claims arise out of the same transaction or occurrence, that being the alleged conspiracy to fix prices in the HFCS market, and that common questions of law and fact are present. While possibilities of settlement may be enhanced by the proposed severance, the interest of judicial economy would weigh against it. It is also clear that although there is some amount of evidence that applies only to the case against ADM, there is nevertheless a substantial body of witnesses and other evidence that is part of the case against all Defendants. Thus, the inquiry really boils down to the question of prejudice.

Given the somewhat unique nature of the proof in this case as reflected in the numerous evidentiary rulings made by the Court in resolving the various motions in limine, there is no question that there is the potential for significant prejudice to the non-ADM Defendants due to guilt by association or spillover from the large amount of 404(b) evidence that has been held to be admissible only against ADM. Within that 404(b) evidence are sporadic references to the non-ADM Defendants that are not, as to substance, clearly linked to the alleged HFCS conspiracy, and other evidence conveyed by way of tapes made during the FBI's undercover investigation of price-fixing at ADM. Wilson and Andreas, former ADM executives, have invoked the Fifth Amendment in response to all substantive questions posed to them during their depositions, and the Seventh Circuit has held that this entitles Plaintiffs to suggest that adverse inferences be drawn against ADM. It has been suggested that the nature of this evidence resists limiting instructions and that there is a range of permissible argument that can be made by Plaintiffs that will undercut the effectiveness of any proposed limitation; these are far from frivolous suggestions. Finally, the jury will hear expert testimony indicating that the nature of the industry would not permit a conspiracy to succeed unless all of the major players, which would include the non-ADM Defendants, were on board.

On the other hand, holding two completely separate trials would necessarily saddle the Plaintiffs with a greater burden, expense, and delay, as well as being contrary to the interests of judicial economy. To some degree, these consequences could be mitigated by seating two juries simultaneously, one of which would hear the case against ADM and the other of which would hear the case against the non-ADM Defendants. Although this possibility would not

be a perfect solution, as it presents both logistical problems and the possibility of arguably inconsistent verdicts, it is the best alternative that the Court can identify in an attempt to recognize the Plaintiffs' entitlement to present the full range of otherwise admissible evidence in their case against ADM while protecting the non-ADM Defendants' entitlement to receive a fair trial untainted by prejudicial spillover. The question is whether the Court has the authority to craft such an exceptional remedy to address the exceptional circumstances of this case, or whether such a remedy would constitute an abuse of discretion.

While the Court is confident of its authority to grant a severance in an appropriate case, such as where there has been a misjoinder, to cure jurisdictional defects, or where the nature of the evidence is such that there are effectively different cases to be made against different parties, none of these circumstances apply in the present litigation. In fact, diligent research by both the parties and the Court has uncovered no case in which a Rule 21 severance has been granted in a civil conspiracy case. That being said, research has uncovered some authority indicating that severance is inappropriate where the issue presented is a "unitary problem," such as the single conspiracy alleged in this case. In *Hebel v. Ebersole,* 543 F.2d 14, 17 (7th Cir.1976), the Seventh Circuit cited *Spencer, White & Prentis, Inc. of Conn. v. Pfizer,* 498 F.2d 358, 362 (2nd Cir.1974), in noting that a "district court's discretion in severing claims under Rule 21 may not be abused '... to separate an essentially unitary problem....'" *See also, Rice v. Sunrise Express,* 209 F.3d 1008, 1016 (7th Cir.2000) (noting that the severance granted was not an attempt to sever an essentially unitary problem.) In light of this authority, the Court feels constrained to find that it does not have the discretion to grant the requested severance, and the non-ADM De-

fendants' Motion for Severance must therefore be denied.

In an effort to be absolutely clear on this point, the Court is less than satisfied by this resolution. In a joint trial, the only possible way to ensure that the non-ADM Defendants receive a fair trial is to substantially limit the Plaintiffs proof in the presentation of their case pursuant to Rule 403. Yet this will substantially prejudice the Plaintiffs, which is also troubling to the Court. If this Court believed that it had authority to sever the non-ADM Defendants and go to trial with two juries sitting simultaneously, the Court would not hesitate to enter an order precisely to that effect, because it is the firm conviction of the Court that in a situation where there is no perfect solution, such an option is the best way to most fairly address the competing legitimate concerns of prejudice to the non-ADM Defendants and Plaintiffs' ability to fully present their case against ADM. The request of the parties for leave to submit supplemental precedent on the scope of the Court's authority is hereby granted in that the Court will accept submissions filed within seven days from the date of this Order.