**Jan Randolph MARTIN, Plaintiff,**

v.

**The CITY OF INDIANAPOLIS, Defendant.**

**No. IP 96–0330–C–B/S.**

United States District Court, S.D. Indiana, Indianapolis Division.

Oct. 3, 1997.

**628**

Scott Hodes, Ross & Hodes, Chicago, IL, Jennifer E. Matthews, Martinsville, IN, for Plaintiff.

Brian W. Welch, McHale, Cook & Welch, Indianapolis, IN, for Defendant.

### ENTRY DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

BARKER, Chief Judge.

This matter comes before the Court on Plaintiff's motion for summary judgment and Defendant's cross–motion for summary judgment. For the reasons set forth below, the Court hereby *denies* Defendant's motion for summary judgment and *grants* Plaintiff's motion for summary judgment.

### I. STATEMENT OF FACTS

Plaintiff, Jan Randolph Martin ("Martin"), is an artist who resides in Indianapolis. *See* Complnt. ¶ 1. Defendant, the City of Indianapolis (the "City"), is a municipal corporation incorporated in Indiana. *See* Complnt. ¶ 2; City Answer ¶ 2. Martin graduated from Purdue University in 1970 with a degree in fine arts and received a Master of Fine Arts degree from The School of the Art Institute of Chicago in 1975 and a Master of Arts degree from Bowling Green State University in 1976. *See* Complnt. ¶ 6. In 1977, Martin joined Tarpenning–Lafollette Co. as a designer, engineer and fabricator of sheet metal. *See* Martin Aff. ¶ 1. At the 55th Annual Hoosier Salon Art Show in 1979, Martin's "Model for Large Sculpture" was awarded a $1,000 prize for Best of Show, Outstanding Work in Any Medium. *See* Martin Aff. ¶ 6. Martin's artwork has been displayed in the Indianapolis Museum of Art and the Art Institute of Chicago, and Martin created a time capsule for the Indianapolis Museum of Art Centennial in 1983. *See* Complnt. ¶ 13.

On August 15, 1984, Martin addressed the Indianapolis Metropolitan Commission Zoning Board regarding his proposal to erect a sculpture of stainless steel from his prize–winning "Model of Large Sculpture." *See* Complnt. ¶ 14. On November 8, 1984, the City issued Commitment No. 840093291 (the "Project Agreement"), granting a variance to permit construction of Martin's sculpture at 1020 North Missouri Street, Indianapolis, a site owned by John Lafollette, Chairman of Tarpenning–Lafollette. *See* Complnt. ¶ 15; Martin Admiss. Nos. 2–3. Martin created the sculpture, entitled "Symphony # 1," on weekends and holidays over a period of 2½ years, completing construction on or about May 7, 1987. *See* Complnt. ¶ 17; Martin Aff. ¶¶ 4, 10.

Subsequent to the installation of Symphony # 1, the Director of Metropolitan Development determined that it was necessary for the City to acquire the property on which Symphony # 1 was located, among other properties, in accordance with its Urban Renewal Development Plan. *See* City Resp. /Mot. Br. at 5. On April 24, 1992, the City mailed a letter to all property owners, including John Lafollette, advising them of the City's intent to acquire their land. *See* Martin Admiss. No. 4. Martin and Tarpenning–Lafollette protested the City's planned acquisitions, and Martin offered to donate the sculpture to the City in return for the City's assuming the cost to remove and reinstall it,

with Martin's assistance. *See* Martin Admiss. Nos. 7–8; Complnt. ¶¶ 20, 23.

Despite Martin's protests, the City acquired the land on which Symphony # 1 was located, pursuant to a Purchase Agreement (the "Purchase Agreement"), dated September 30, 1993. *See* Complnt. ¶ 27. At the closing of the Purchase Agreement, Martin again offered to donate the sculpture to the City and informed the City that he had designed the sculpture so that it could be disassembled and moved easily and without damage, at an $8,000 estimated cost for removal and relocation. *See* Martin Aff. ¶ 17; Complnt. ¶ 28. On May 18, 1995, the City opened public bidding on Demolition and Site Clearance, 1995 Contract No. 1 in the Northwest Redevelopment/Canal Development Area of the City of Indianapolis. *See* Martin Prop. Undisp. Facts ¶ 45. The contract included a "metal sculpture (yard ornament, anchors and base)" at 1020 North Missouri Street, also identified as a "stainless steel sculpture." Martin Prop. Undisp. Facts ¶ 45. The City awarded the contract to Jordan Demolition Company, and on or about July 20, 1995, Symphony # 1 was demolished by Jordan Demolition at a reported cost of $330.00. *See* Complnt. ¶ 29; Martin Prop. Undisp. Facts ¶¶ 46–47, 52; City Admiss. ¶ 13. In a letter dated December 29, 1995, Martin notified the City of his intent to make a claim, which the City denied on January 29, 1995. *See* Complnt. ¶¶ 32–33. Martin subsequently filed this action on March, 11, 1996.

## II. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a jury to return a verdict in favor of the nonmoving party on the particular issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Methodist*

*Med. Center v. American Med. Sec., Inc.,* 38 F.3d 316, 319 (7th Cir.1994). In considering a summary judgment motion, a court must draw all justifiable inferences in a light most favorable to the opposing party, and must resolve any doubt against the moving party. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513; *Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir.1992); *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991).

While the burden rests squarely on the party moving for summary judgment to show "that there is an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), the nonmoving party may not simply rest on the pleadings, but must affirmatively demonstrate by specific factual allegations that a genuine issue of material fact exists for trial. *See Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Billups v. Methodist Hosp. of Chicago,* 922 F.2d 1300, 1302 (7th Cir.1991). Conclusory allegations by a party opposing a motion for summary judgment cannot defeat the motion. *See Smith v. Shawnee Library System,* 60 F.3d 317, 320 (7th Cir.1995). "The moving party is 'entitled to a judgment as a matter of law' [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. If doubts remain, however, as to the existence of a material fact, then those doubts should be resolved in favor of the nonmoving party and summary judgment denied. *See Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir. 1989).

## III. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Martin asserts a claim against Defendant City under the Visual Artists Rights Act of 1990, 17 U.S.C. § 101 et seq. ("VARA"), for destruction of a stainless steel sculpture created by Martin, entitled "Symphony # 1." The Visual Artists Rights Act of 1990:

protects both the reputations of certain visual artists and the works of art they

create. It provides these artists with the rights of "attribution" and "integrity." ... These rights are analogous to those protected by Article 6b is of the Berne Convention, which are commonly known as "moral rights." The theory of moral rights is that they result in a climate of artistic worth and honor that encourages the author in the arduous act of creation.

*Carter v. Helmsley–Spear, Inc.,* 71 F.3d 77, 83 (2d Cir.1995) (quoting H.R.Rep. No. 514, 101st Cong., 2d Sess. 5 (1990)). Martin alleges a violation of his integrity rights under VARA, which rights allow artists to protect works of visual art from modification prejudicial to their honor or reputation as well as destruction. *See* 17 U.S.C. § 106A(a)(3). The statute reads, in relevant part, "[T]he author of a work of visual art ... shall have the right to prevent any destruction of a work of recognized stature, and any intentional or grossly negligent destruction of that work is a violation of that right." 17 U.S.C. § 106A(a)(3)(B).

The City moves for summary judgment against Martin and asserts four affirmative defenses, contending that (1) Martin has not shown by admissible evidence that Symphony # 1 was a work of recognized stature, (2) Symphony # 1 was advertising not protected by VARA, (3) Symphony # 1 was a "work made for hire" not protected by VARA and (4) Martin waived his rights under VARA. The Court will address each of the City's arguments in turn.

### A. "Work of Recognized Stature"

The City's first argument in support of its motion for summary judgment is that Martin has failed to prove that Symphony # 1 was a "work of recognized stature" within the meaning of § 106A(a)(3)(B). The City maintains that all of the evidence Martin has proffered to show Symphony # 1 was a work of recognized stature is inadmissible hearsay and thus Martin has failed to prove this essential element of his claim, compelling the Court to rule in favor of the City as a matter of law. *See* City Resp./Mot. Br. at 22–23.

In a separate motion, the City objects to the admission of certain exhibits offered by Martin to show that Symphony # 1 was a work of recognized stature, including newspaper and magazine articles as well as letters and awards regarding Martin's artwork. The City argues that these exhibits are inadmissible hearsay and may not be considered by the Court in deciding Martin's motion for summary judgment. Martin asserts that the exhibits are not hearsay because the statements contained in the exhibits are not being offered for the truth of the matters asserted, but only to show that the various declarants discussed Symphony # 1, i.e., that the declarants, in fact, made the statements. *See* Martin Rep./Resp. Br. at 11.

■ Hearsay is defined in the Federal Rules of Evidence as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Inadmissible hearsay statements may not be considered as supporting evidence for a summary judgment motion. *See Hong v. Children's Memorial Hosp.,* 993 F.2d 1257, 1265 (7th Cir.1993). The statements contained within the proffered newspaper and magazine articles and letters are offered by Martin to show that respected members of the art community and members of the public at large consider Martin's work to be socially valuable and to have artistic merit, and to show the newsworthiness of Symphony # 1 and Martin's work. These statements are offered by Martin to show that the declarants *said* them, not that the statements are, in fact, true. The critical element of "recognized stature" involves community opinion about Martin's work, not a determination that Martin's work is inherently meritorious. The statements contained within the exhibits show how art critics and the public viewed Martin's work, particularly Symphony # 1, and show that the sculpture was a matter worth reporting to the public. Therefore, the statements contained within these challenged exhibits are not hearsay because they are not being offered for the truth of the matters asserted therein. Accordingly, the City's objection to the admission of Martin's exhibits as inadmissible

hearsay is *denied.*[1]

As the Court has ruled that Martin's exhibits relating to community opinion of his artwork are admissible, we may now consider these exhibits to determine whether Martin has shown that Symphony # 1 was a work of recognized stature. The term "recognized stature" is not defined in VARA. However, the court in *Carter v. Helmsley–Spear,* 861 F.Supp. 303 (S.D.N.Y.1994), provides some guidance, stating that "the recognized stature requirement is best viewed as a gate–keeping mechanism—protection is afforded only to those works of art that art experts, the art community, or society in general views as possessing stature." *Helmsley–Spear I,* 861 F.Supp. at 325. The court noted that the statute does not require a plaintiff to prove that his artwork rivals that of "Picasso, Chagall, or Giacometti," but rather serves as a deterrent for nuisance suits, such as "the destruction of a five–year-old's fingerpainting by her class mate." *Helmsley–Spear I,* 861 F.Supp. at 325. The court in *Helmsley–Spear I* set forth a two-tiered test for determining whether the recognized stature requirement has been met, requiring that a plaintiff show: "(1) that the visual art in question has 'stature,' i.e. is viewed as meritorious, and (2) that this stature is 'recognized' by art experts, other members of the artistic community, or by some cross-section of society." *Helmsley–Spear I,* 861 F.Supp. at 325.

Martin has produced significant evidence, including exhibits and affidavits, tending to show that Symphony # 1 was a work of recognized stature. The City has advanced no factual dispute regarding Martin's evidence, so the Court will consider the facts contained within these exhibits and affidavits as undisputed. The most compelling evidence is outlined as follows: (1) The model for Symphony # 1 was awarded the "Best of Show, Outstanding Work in Any Medium" at the 55th Annual Hoosier-Salon Art Show in 1979, which event and award were reported in local Indianapolis newspapers. *See* Martin Aff. ¶ 6; Martin Exh. E. (2) Martha Win-

ans, Director of the Herron Gallery of the Herron School of Art at Indiana University, Indianapolis supported funding for Symphony # 1, describing the proposed sculpture as "an interesting and aesthetically stimulating configuration of forms and structure." *See* Martin Exh. I.(3) Steve Mannheimer, art critic for *The Indianapolis Star* and an associate professor at Herron School of Art, described Symphony # 1 as "a fine piece of public sculpture, thoroughly competent in its design and execution and, more important, a significant human gesture." *See* Martin Exh. M. (4) Local Indianapolis publications reported on the proposed construction of Symphony # 1 and favorably reviewed the completed sculpture. *See* Martin Exh. M. (5) The Indiana Arts Commission's *Quarterly* featured Symphony # 1, among other works, in its article "On Site: Contemporary Art in Indiana's Public Places." *See* Martin Exh. M. (6) One member of the community expressed his appreciation of the proposed sculpture in a published letter to the editor. *See* Martin Exh. M.

After examining the evidence put forth by Martin, the Court determines that Martin's sculpture, Symphony # 1, was a work of recognized stature within the meaning of the statute. Accordingly, the Court *denies* the City's motion for summary judgment on the basis that Martin failed to prove that Symphony # 1 was a work of recognized stature.

### B. "Advertising"

The City's second argument in support of its summary judgment motion is that Martin cannot recover under VARA for destruction of Symphony # 1 because the sculpture was advertising excluded from VARA protection. The relevant portion of § 101 sets forth, "A work of visual art does not include—... any merchandising item or advertising, promotional, descriptive, covering, or packaging material or container." 17 U.S.C. § 101. The City argues that Symphony # 1 is advertising because (1) the sculpture was constructed from the same materials used by Tarpenning–Lafollette in its business and lo-

---

**1.** However, some of the exhibits offered into evidence by Martin must be excluded for a lack of proper foundation, specifically, the programs and awards, as well as certain invoices relating to the cost of materials used in building Symphony # 1.

cated on property contiguous to the Tarpenning–Lafollette building, (2) the sculpture was placed on property owned by John Lafollette, the owner of Tarpenning–Lafollette at the time, (3) Tarpenning–Lafollette provided all the materials and labor used to build the sculpture, (4) the sculpture was included in Tarpenning–Lafollette's advertising brochure and (5) Tarpenning–Lafollette's purpose in including the sculpture in the advertising brochure was to highlight Tarpenning–Lafollette's versatility, strength in craftsmanship and creativity. *See* Defendant Mot./Resp. Br. at 14–15.

Martin counters that, while the Tarpenning–Lafollette brochure that pictured Symphony # 1 is advertising within the meaning of the statute, the sculpture itself was not. *See* Martin Resp./Rep. Br. at 4. Martin argues that Symphony # 1 was a sculpture existing in a single copy entitled to protection under VARA as a one-of-a-kind piece of visual art. *See* Martin Resp./Rep. Br. at 4. Further, Martin argues that the sculpture was not an advertisement for Tarpenning–Lafollette's business, for the sculpture contained no signage identifying it with Tarpenning–Lafollette or any other commercial enterprise. *See* Martin Resp./Rep. Br. at 4–5.

■ The parties have not provided any case law interpreting "advertising" within the meaning of § 101, and the Court has been unable to locate any relevant authority. However, the word, "advertise," is defined in Webster's Dictionary as "to call public attention to especially by emphasizing desirable qualities so as to arouse a desire to buy or patronize." Webster's Third Int'l Dictionary (1993). "Advertising" contemplates a printed or broadcast public advertisement. *See* Webster's Third Int'l Dictionary (1993). While the brochure printed by Tarpenning–Lafollette containing a photographic image of Symphony # 1 is clearly advertising material within this meaning, the action brought by Martin involves destruction of the sculpture, not the advertising brochure.

■ No reasonable construction of the facts in this case could make Symphony # 1 merely a piece of advertising material. The fact that the sculpture was made of sheet metal that was provided by Tarpenning–La-

follette and was situated on land owned by John Lafollette near the Tarpenning–Lafollette plant did not publicly advertise Tarpenning–Lafollette's business, especially as there were no identifying marks or signage on the sculpture. In addition, the sculpture was located across the canal from Tarpenning–Lafollette, actually adjacent to the Breidensteiner Company, a location not clearly designated to the public as Tarpenning–Lafollette land. *See* Martin Exh. P (JM 00361–00363). Further, the inclusion of the sculpture in the advertising brochure did not transform the sculpture itself into advertising, any more than a photograph of the State Capitol included in an advertising medium would turn the State Capitol into mere advertising. The City's arguments regarding the alleged benefits enjoyed by Tarpenning–Lafollette resulting from Symphony # 1 in any event are more appropriately addressed in the "work made for hire" analysis below. Thus, for the reasons set forth above, the City's motion for summary judgment on the basis that Symphony # 1 was advertising is *denied.*

### C. "Work Made for Hire"

The City also moves for summary judgment on the basis that Symphony # 1 was a work made for hire under § 101 and thus excluded from VARA protection. The statute provides in relevant part, "A work of visual art does not include—... any work made for hire.... A 'work made for hire' is—... a work prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101. The City argues that Martin created Symphony # 1 within the scope of his employment at Tarpenning–Lafollette, asserting "the interest of Tarpenning–Lafollette was clearly served by the building of Symphony # 1." City Resp./Mot. Br. at 19. The City maintains that Martin was an employee of Tarpenning–Lafollette and that designing, fabricating and installing Symphony # 1 was within the scope of Martin's employment as a designer and engineer for Tarpenning–Lafollette. *See* City Rep. Br. at 8–9. In support of its theory, the City cites the fact that Tarpenning–Lafollette supplied all of the materials and some of the labor for

constructing Symphony # 1 (*See* City Resp. /Mot. Br. at 19–20) and asserts, "There can be no doubt that Tarpenning–Lafollette gained recognition and attention by the placement of Symphony # 1 directly adjacent to its facility." City Resp./Mot. Br. at 19.

Martin contends that Symphony # 1 was a work of art entirely conceived, created and owned by him as an artist, a personal project unrelated to his employment at Tarpenning–Lafollette. *See* Martin Resp./Rep. Br. at 6–8. He concedes that John Lafollette provided all of the materials and 78 hours of labor from Tarpenning–Lafollette employees and contributed the site for the sculpture, but he argues that this was an act of generosity. *See* Martin Resp./Rep. Br. at 8. Martin asserts that all of the hours he worked on the sculpture were non-company hours drawn from his spare time on weekends and holidays, over a period of 2½ years. *See* Martin Resp./Rep. Br. at 9. Moreover, he maintains that his responsibilities at Tarpenning–Lafollette did not include creating original works of art like Symphony # 1. *See* Martin Resp. /Rep. Br. at 9.

 VARA does not provide definitions of "employee" and "scope of employment." However, the Supreme Court in *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) established that a court must apply the general common law of agency to evaluate whether a particular work was "prepared by an employee within the scope of employment" for purposes of § 101. *Reid*, 490 U.S. at 740–41, 109 S.Ct. at 2172–73. There is no dispute between the parties that Martin was an employee of Tarpenning–Lafollette. Therefore, the issue of whether Symphony # 1 was a work made for hire turns on whether the sculpture was created by Martin within the scope of his employment. Section 228 of the Restatement (Second) of Agency states:

(1) Conduct of servant [2] is within the scope of employment if, but only if:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits; [and]

(c) it is actuated, at least in part, by a purpose to serve the master....

Restatement (Second) of Agency § 228(1) (1958). The fact that an employee is in the general employment of the employer does not create an inference that the conduct in question was within the employee's scope of employment. *See* Restatement (Second) of Agency § 228 cmt. b. Therefore, the Court will examine each element of the scope of employment test in turn.

### 1. "Kind of Work"

The City contends that creating Symphony # 1 was the "kind of work" that Martin was hired to perform and the kind of work that he, in fact, performed for Tarpenning–Lafollette. Despite the City's arguments, the Court finds that Symphony # 1 was not the kind of work Martin was employed to perform, based on the following analysis.

The City argues that "Tarpenning–Lafollette currently is and was in 1985, in the business of designing, fabricating and engineering metal sculptures for ornamental and artistic purposes as well as metal pieces for utilitarian or functional purposes." City Resp./Mot. Br. at 18. However, the City overstates the scope of Tarpenning–Lafollette's ornamental sheet metal business, which primarily consists of creating decorative functional pieces.[3] The City also refers to deposition testimony of a Tarpenning–Lafollette representative that ornamental sheet metal comprised 35–40% of Tarpenning–Lafollette's work in 1985 (*see* City Resp./Mot. Br. at 18), but fails to include the rest of that deposition testimony, which recounts that in 1990, only about 10–15% of Tarpenning–Lafollette's work involved ornamental work and

---

**2.** The word "employee" has replaced "servant" in statutes dealing with the employment relationship, but the two words are generally synonymous. *See* Restatement (Second) of Agency § 220 cmt. g. (1958).

**3.** For example, the ornamental work Tarpenning–Lafollette created for its largest ornamental project, the Proctor & Gamble project in 1984, consisted of "stainless steel fountains, stair rails, trim that went through the building, about seven miles of it, columns, door poles, light enclosures, fascia." Martin Dep. at 15.

that the large percentage in 1985 stemmed from one large project that year for Proctor & Gamble's headquarters in Cincinnati, Ohio. *See* Kim Martin Dep. at 23–24.

As Martin admits, his job responsibilities at Tarpenning–Lafollette include designing and fabricating sheet metal for Tarpenning–Lafollette's customers. *See* Martin Aff. ¶ 1. However, Martin's design work for Tarpenning–Lafollette primarily entails translating designs submitted by clients to forms suitable for metal fabrication, more in the nature of engineering, not the creation of original works of art. *See* Martin Dep. at 13–26. Tarpenning–Lafollette's business is primarily fabrication and design incident to fabrication, and has never included the sale of original artwork. *See* Martin Rep./Resp. Br. at 9. Moreover, when Martin's artistic abilities are required for a particular design, he demands an artistic fee from the customer, a commission paid to him directly, separate from Tarpenning–Lafollette, to compensate him for his special knowledge, background and artistic abilities. *See* Martin Dep. at 33–34.

In the course of his work, Martin generally handles only the designs themselves, while the pieces are fabricated in the Tarpenning–Lafollette shop, sometimes under Martin's supervision. *See* Martin Dep. at 32. Martin stopped working in the fabricating part of the business in 1982. *See* Martin Dep. at 69. While constructing Symphony # 1, Martin designed and constructed the entire sculpture himself, spending more than 1,300 hours, with limited help from Tarpenning–Lafollette employees (78 hours) to construct mounting brackets and install the sculpture. *See* Martin Dep. at 83. Thus, it becomes clear that Martin's involvement in every aspect of creating Symphony # 1 differed significantly from Martin's normal course of work for Tarpenning–Lafollette. After considering all of the above, the Court easily concludes that Symphony # 1 was not the kind of work Martin was employed to perform. Although the Court has determined that Symphony # 1 was not the kind of work Martin was hired to perform, the Court will address the other two elements in order to provide a complete analysis of whether the sculpture was a "work made for hire."

### 2. "Substantially Within Time and Space Limits"

The City does not dispute that Symphony # 1 was not created within the time and space limits of Martin's employment, as Martin created the sculpture on his own time, during weekends and holidays. *See* City Resp./Mot. Br. at 20; Martin Aff. ¶ 8. The Court accordingly finds that Symphony # 1 was not created substantially within the time and space limits of Martin's employment. However, the City maintains that this fact is not dispositive. "Neither the case law nor the legislative history suggests that a person can avoid the 'work made for hire' doctrine merely by preparing the work during non–working hours." *Marshall v. Miles Lab., Inc.,* 647 F.Supp. 1326, 1330 (N.D.Ind.1986). Therefore, the City argues, if the work is the kind the employee was employed to perform, it is a work made for hire even though it was completed during non–working hours. *See* City Resp./Mot. Br. at 20. As the Court has found that Symphony # 1 was not the kind of work Martin was hired to perform, the City's argument is unavailing.

### 3. "Actuated by a Purpose to Serve the Master"

■ In order to satisfy the third element of the work–made–for–hire doctrine, the City must show that Martin was at least "appreciably" motivated by a desire to further Tarpenning–Lafollette's corporate goals. *See Avtec Systems, Inc. v. Peiffer,* 21 F.3d 568, 572 (4th Cir.1994). The City claims that Tarpenning–Lafollette has enjoyed many benefits from the construction of Symphony # 1, particularly its inclusion in the advertising brochure. Our analysis must be directed, not at the alleged beneficial effect on Tarpenning–Lafollette, but at the motivation of Martin. The state of mind of the employee is the material determination; the court may consider the employee's actions or other manifestations only as evidence of the employee's state of mind. *See* Restatement (Second) of Agency § 235 cmt. a.

■ Martin contends that Symphony # 1 was for him a personal project. *See* Martin Aff. ¶ 8. This contention is supported by (1)

the fact that Martin received no compensation for his work on the sculpture, (2) the impressive number of hours Martin devoted to the sculpture's creation, (3) the length of time Martin spent building the sculpture, indicating a lack of urgency, (4) the fact that Martin spent his spare time on weekends and holidays in the sculpture's construction, (5) the fact that others were included in the project only for the mechanical installation of the sculpture, (6) the fact that Martin signed the Project Agreement among Martin, Tarpenning–Lafollette and the City, dated November 8, 1984, as the "owner of the sculpture," while John Lafollette was identified as the "owner of the land" (*See* Martin Exh. L.), and (7) the fact that, aside from his work at Tarpenning–Lafollette, Martin is a serious, independent artist who uses stainless steel as a medium. *See* Martin Aff. ¶ 2. In addition, Martin's placement of the sculpture along the canal at a reasonable distance from Tarpenning–Lafollette supports his contention that he intended Symphony # 1 to be a public sculpture. The land, in fact, was owned by John Lafollette, not Tarpenning–Lafollette, and while Martin could have placed the sculpture in closer proximity to the Tarpenning–Lafollette plant, he placed it instead on an undeveloped parcel of land along the canal.

As we have earlier determined, Symphony # 1 was not advertising, in that the sculpture contained no features that specifically promoted the business of Tarpenning–Lafollette. Also, Symphony # 1 was not commissioned by one of Tarpenning–Lafollette's customers or sold to a customer after being constructed. Thus, the sculpture was not constructed for the purpose of commercial promotion of Tarpenning–Lafollette or on behalf of a customer, although these would be the two main economic motivations for a business such as Tarpenning–Lafollette to commission such a sculpture. Moreover, Martin received no artistic commission or any compensation at all for creating the sculpture. *See* Martin Aff. ¶ 9.

These facts as set forth above dictate a conclusion that Martin's creation of Symphony # 1 was a personal project not actuated by a purpose to serve Tarpenning–Lafollette.

The sculpture was not the kind of work Martin was hired by his employer to perform, the sculpture was not created within the time and space limits of Martin's employment with Tarpenning–Lafollette, and the sculpture's construction was not actuated by a purpose to serve Tarpenning–Lafollette. We therefore conclude that Symphony # 1 was not a work made for hire excluded from VARA protection. Accordingly, the Court *denies* the City's motion for summary judgment on the basis that Symphony # 1 was a work made for hire.

### D. Waiver of VARA Rights

The City contends that, even if the Court finds that Symphony # 1 is a work of visual art entitled to VARA protection, Martin waived his rights under VARA when he signed the Project Agreement as part of the variance he obtained from the City to build Symphony # 1. *See* City Resp./Mot. Br. at 23–24. An artist may waive his VARA rights by express agreement in a written document that specifically identifies the work and the uses to which the waiver applies. 17 U.S.C. § 106A(e)(1). The City maintains that the Project Agreement, signed by Martin on November 5, 1984, constitutes an effective waiver under VARA. *See* City Resp./Mot. Br. at 24. The City directs the Court to Attachment B of the Project Agreement (Martin Exh. L), which provides as follows:

Section 8–Special Provisions:

1. Should the Department of Metropolitan Development determine that the subject sculpture is no longer compatible with the surrounding land use or that the Department of Metropolitan Development determines that the acquisition of the subject property is necessary in carrying out the Urban Renewal Plan for the project, the owners will remove the sculpture at their own cost.

2. The owner of the land and the owner of the sculpture agree to waive any rights to relocation benefits and further agrees [sic] not to make any claims for damages against the City for said removal [of] sculpture.

3. Should a determination be made by the Department of Metropolitan Development

that the subject sculpture is no longer compatible with the existing land use or that the acquisition of the property is necessary, the owner of the land and the owner of the sculpture will receive written notice signed by the Director of the Department of Metropolitan Development giving the owners of the land and sculpture ninety (90) days to remove said sculpture. Subject to weather and ground conditions.

Looking to the terms of the Project Agreement, the City argues that the special provisions in Section 8 constitute a waiver by Martin of a broad scope of rights, including the rights protected by VARA and any right to recover damages for the removal of the sculpture. *See* City Resp./Mot. Br. at 23–24. The City contends that VARA cannot alter the terms of the Project Agreement because "VARA was not enacted at the time this agreement was signed," and thus "the parties [sic] intentions must be presumed based on the language of the agreement and their subsequent conduct." City Resp./Mot. Br. at 24.

While Martin concedes that VARA does not alter the terms of the Project Agreement (*see* Martin Rep./Resp. Br. at 12), he maintains that the Project Agreement does not mention or even contemplate destruction of the sculpture, merely removal. *See* Martin Mot. Br. at 14–15. It is clear from the language of the Project Agreement, Martin argues, that he never agreed to destruction of Symphony #1 and thus never waived his rights under VARA, as an effective waiver of VARA rights must identify the specific uses to which the waiver applies. *See* Martin Rep./Resp. Br. at 12. In addition, Martin contends that section 8(3) of the Project Agreement creates a condition precedent of 90 days' written notice to remove the sculpture before Martin's obligations under sections 8(1) and 8(2) were due. *See* Martin Mot. Br. at 13. Martin asserts that the notice requirement of section 8(3) was not met, for he never received written notice

from the City requesting him to remove the sculpture within 90 days. *See* Martin Mot. Br. at 14. Therefore, Martin argues, his obligation to remove the sculpture and his waiver of damages from the City for such removal never matured. *See* Martin Mot. Br. at 14.

■ "Summary judgment is appropriate in a matter of contract interpretation where no issues of fact exist because the language of the contract is unambiguous." *Grundstad v. Ritt,* 106 F.3d 201, 205 (7th Cir.1997); *see also Bechtold v. Physicians Health Plan of Northern Indiana, Inc.,* 19 F.3d 322, 325 (7th Cir.1994). "Where the terms of a contract are clear the court merely applies its provisions. Unambiguous language is conclusive upon the parties to the contract and the courts." *Turnpaugh v. Wolf,* 482 N.E.2d 506, 508 (Ind.Ct.App.1985). If the contract language is unambiguous, the court must look to the four comers of the contract to determine the intent of the parties. *See Turnpaugh v. Wolf,* 482 N.E.2d at 508. The Court finds that the language in section 8 of the Project Agreement is unambiguous and will address the parties' contentions accordingly.

■ Section 8 incorporates the full agreement between the parties regarding removal of Symphony #1. The provisions of section 8 set forth that, in the event that the City determined it was necessary, Martin would remove the sculpture at his own cost. Further, Martin agreed not to bring any claims against the city for any relocation benefits or reimbursement for those removal costs.[4] In addition, the City was obligated to provide Martin with 90 days' written notice to remove the sculpture. The contract in no way discusses or contemplates destruction of the sculpture and Martin's agreement thereto. As a waiver of an artist's rights under VARA must be specific as to use and should be strictly construed (*see* 3 Nimmer on Copyright § 8D.06D at 8D–84 (1997)), the Project Agreement is not an effective waiver of Mar-

---

**4.** The claims waived by Martin in the contract relate only to removal costs in the event that Martin had removed the sculpture at his own cost. The City's assertion that the waiver of damages provision in the contract served as a waiver of all claims against the City relating to removal of the sculpture (*See* City Resp./Mot. Br. at 24) is not supported by the clear language of the contract.

tin's right to protect the sculpture from destruction under VARA.

■ In addition, even if the Project Agreement were found to be an effective waiver, Martin contends correctly that the provisions of the contract make the 90 days' notice a condition precedent to Martin's promise to remove the sculpture at his own cost. Consequently, unless the City gave Martin proper notice under the contract, Martin had no obligation to remove the sculpture and the waiver would not apply.

The parties do not dispute the fact that the City never gave Martin written notice allowing him 90 days to remove Symphony # 1, or even written notice of the City's intent to acquire the land where the sculpture was located. *See* City Resp./Mot. Br. at 25–26; Martin Rep./Resp. Br. at 12. Nevertheless, the City advances the argument that Martin had actual notice far in excess of 90 days that the City intended to acquire the land and that the sculpture would be destroyed, by virtue of Martin's having read the written notice to John Lafollette, dated April· 24, 1992, and attended a remonstrance meeting to protest the City's purchase of the land. *See* City Resp./Mot. Br. at 25. Even if this suffices as actual notice that the City planned to acquire the land, Martin did not have notice, written or otherwise, to remove the sculpture before the City removed or demolished it. Because the contract required written notice to remove the sculpture before the obligation was imposed on Martin to remove it, Martin's promises under the Project Agreement had not ripened. Thus, Martin's failure to remove the sculpture did not constitute a waiver of his rights under VARA. The City's motion for summary judgment on the basis that Martin waived his VARA rights is accordingly *denied.*

Having resolved each of the City's affirmative defenses supporting its summary judgment motion, the Court hereby *denies* the City's motion for summary judgment.

## IV. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Martin moves for summary judgment on his claim against Defendant City under VARA. In ·order to prove that Symphony # 1 was destroyed in violation of VARA, Martin must show that (1) he was the author (2) of a work of visual art (3) within the scope of VARA (4) which was of recognized stature and (5) which was intentionally destroyed. *See* 17 U.S.C. § 106A(a)(3)(B). For the reasons set forth below, the Court finds that Martin has established all five elements of his claim and he is entitled to summary judgment.

■ In order to succeed on summary judgment, Martin must first show that he was the author, or creator, of Symphony # 1. "Author," within the meaning of § 101, involves an analysis of who owns the copyright interests in an individual work. When a work is created by an individual author outside the employment relationship, the creator is the author for purposes of copyright law. *See* Paul Goldstein, I *Copyright* § 4.1 (2d ed.1996). We have already determined that Martin had created Symphony # 1 in his individual capacity (see the "work made for hire" discussion above). Thus, we conclude that Martin was the author of Symphony # 1 for purposes of VARA.

■ Martin next must show that Symphony # 1 was a work of visual art within the meaning of VARA. The statute provides, in relevant part, "A 'work of visual art' is—. . . a painting, drawing, print or sculpture, existing in a single copy. . . ." Martin has presented sufficient evidence to prove that Symphony # 1 was the only sculpture of its kind, and that no copies of it were ever made. The City does not dispute this; in fact, it admits that Symphony # 1 was a sculpture and satisfied the positive test of what constitutes a work of visual art.[5] *See* City Resp. /Mot. Br. at 13. That Symphony # 1 was a work of visual art within the meaning of VARA is clear.

---

5. The City's arguments that Symphony # 1 failed to satisfy the negative test, i.e. what is not a work of visual art, are addressed in the Court's discus- sions of advertising and work made for hire, respectively, above.

Whether Symphony # 1 fell within the scope of VARA comprises the next test. Although VARA did not become effective until June 1, 1991, VARA protection extends to those works of visual art created prior to the effective date in which title was held by the author as of that date. *See* 17 U.S.C. § 106A(d)(2); *see also Pavia v. 1120 Avenue of Americas Assocs.*, 901 F.Supp. 620, 628 (S.D.N.Y.1995). Martin completed Symphony # 1 by the spring of 1987, four years before VARA became effective, but Martin has established that he maintained title to Symphony # 1 during those four years and beyond the 1991 effective date of VARA.[6] Thus, we find that Symphony # 1 was a work of visual art within the scope of VARA.

Martin must also prove that Symphony # 1 was a "work of recognized stature." Again, the City challenges the evidence presented by Martin to prove this element of his case, but having already held that Martin carried his burden of proof regarding Symphony # 1's recognized status in the art community and public (see the Court's discussion above of "recognized stature"), we similarly conclude that Symphony # 1 was a work of recognized stature.

Finally, Martin must show that Symphony # 1 was intentionally destroyed by the City. Martin alleges that Symphony # 1 was destroyed by the Jordan Demolition Corporation acting under contract with the City, which fact the City admits. *See* City Admiss. Nos. 13–14. VARA limits liability for destruction of a work of visual art protected by the statute to acts of intentional or grossly negligent destruction, as opposed to purely accidental acts. *See* H.R.Rep. No. 101–514, 101st Cong. (1990) at 6926. Here, the facts clearly indicate that the City intentionally destroyed the sculpture, rather than by accident, and with this finding, Martin has proved all five elements of his claim under VARA and the City's asserted affirmative defenses have been denied; the Court therefore *grants* summary judgment in Martin's favor.

## V. CONCLUSION

Defendant City has moved for summary judgment on the grounds that Plaintiff Martin cannot maintain his claim under VARA, asserting that (1) Martin failed to show Symphony # 1 was a work of "recognized stature," (2) Symphony # 1 was advertising excluded from VARA protection, (3) Symphony # 1 was a "work made for hire" excluded from VARA protection and (4) Martin waived his VARA rights. None of these contentions can be properly resolved in the City's favor. Thus, the Court denies all four of the City's affirmative defenses and hereby *denies* as well the City's motion for summary judgment.

Plaintiff Martin has moved for summary judgment on his claim under VARA, asserting that (1) he was the author (2) of a work of visual art (3) within the scope of VARA (4) which was of recognized stature and (5) which was intentionally destroyed by the City. We have determined that Martin has established all five elements of his claim under VARA and hereby *grant* Martin's motion for summary judgment.[7]

---

6. See the Court's discussion above of "work made for hire."

7. Having determined that judgment should be entered for Plaintiff, the Court must now consider the issues of damages. The Court cannot determine the proper measure of damages to be awarded from the summary judgment briefs submitted by the parties. Therefore, the Court directs the parties either to submit supplemental briefing on the issue of damages or notify us whether an evidentiary hearing or trial is required to resolve the matter. We will reserve the entry of final judgment in this case until the measure of damages has been resolved.