**Jan Randolph MARTIN, Plaintiff–Appellee/Cross–Appellant,**

v.

**CITY OF INDIANAPOLIS, Defendant–Appellant/Cross–Appellee.**

Nos. 98–4041, 98–4132.

United States Court of Appeals, Seventh Circuit.

Argued June 10, 1999.

Decided Aug. 31, 1999.

died on April 24, 1999.

---

* The Honorable Walter J. Cummings was a member of the original panel; however, he

Gary L. Starkman (argued) and Scott Hodes (on the brief), Ross & Hardies, Chicago, IL, Jennifer E. Matthews, Martinsville, IN, for plaintiff-appellee.

Gary D. Secrest (argued), Office of Corporation Counsel, Indianapolis, IN, for defendant-appellant.

Before WOOD, Jr., RIPPLE and MANION, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

We are not art critics, do not pretend to be and do not need to be to decide this case. A large outdoor stainless steel sculpture by plaintiff Jan Martin, an artist, was demolished by the defendant as part of an urban renewal project. Plaintiff brought a one-count suit against the City of Indianapolis (the "City") under the Visual Artists Rights Act of 1990 ("VARA"), 17 U.S.C. § 101 *et seq.* The parties filed cross-motions for summary judgment. The district court granted plaintiff's motion and awarded plaintiff statutory damages in the maximum amount allowed for a non-wilful statutory violation. *Martin v. City of Indianapolis,* 982 F.Supp. 625 (S.D.Ind.1997), and *Martin v. City of Indianapolis,* 4 F.Supp.2d 808 (S.D.Ind. 1998). Neither party is satisfied. It is necessary to see how this unique controversy came to be.

## I. BACKGROUND

Plaintiff is an artist, but in this instance more with a welding torch than with a brush. He offered evidence to show, not all of it admitted, that his works have been displayed in museums, and other works created for private commissions, including a time capsule for the Indianapolis Museum of Art Centennial. He has also done sculptured jewelry for the Indiana Arts Commission. In 1979, at the Annual Hoosier Salem Art Show, plaintiff was awarded the prize for best of show in any medium. He holds various arts degrees from Purdue University, the Art Institute of Chicago and Bowling Green State University in Ohio. Plaintiff had been employed as production coordinator for Tarpenning–LaFollette Co. (the "Company"), a metal contracting firm in Indianapolis. It was in this position that he turned his artistic talents to metal sculpture fabrication.

In 1984, plaintiff received permission from the Indianapolis Metropolitan Development Commission to erect a twenty-by-forty-foot metal sculpture on land owned by John LaFollette, chairman of the Company. The Company also agreed to furnish the materials. The resulting Project Agreement between the City and the Company granted a zoning variance to permit the erection of plaintiff's proposed sculpture. An attachment to that agreement and the center of this controversy provided as follows:

> Should a determination be made by the Department of Metropolitan Development that the subject sculpture is no longer compatible with the existing land use or that the acquisition of the property is necessary, the owner of the land and the owner of the sculpture will receive written notice signed by the Director of the Department of Metropolitan Development giving the owners of the land and sculpture ninety (90) days to remove said sculpture. Subject to weather and ground conditions.

Plaintiff went to work on the project and in a little over two years it was completed.[1] He named it "Symphony # 1," but as it turns out in view of this controversy, a more suitable musical name might have been "1812 Overture." Because of the possibility that the sculpture might some-day have to be removed, as provided for in the Project Agreement, Symphony # 1 was engineered and built by plaintiff so that it could be disassembled for removal and later reassembled. The sculpture did not go unnoticed by the press, public or art community. Favorable comments ad-mitted into evidence and objected to by the City are now an issue on appeal and their admissibility will be considered hereinaf-ter.

The trouble began in April 1992 when the City notified LaFollette that there would be public hearings on the City's proposed acquisition of various properties as part of an urban renewal plan. One of the properties to be acquired was home to Symphony # 1. Kim Martin, president of the Company and plaintiff's brother, re-sponded to the City. He reminded the City that the Company had paid for Symphony # 1, and had signed the agreement with the Metropolitan Development Corpora-tion pertaining to the eventuality of remov-al. Martin stated that if the sculpture was to be removed, the Company would be willing to donate it to the City provided the City would bear the costs of removal to a new site, but that plaintiff would like some input as to where his sculpture might be placed. Plaintiff also personally ap-peared before the Metropolitan Develop-ment Commission and made the same pro-posal. This was followed by a letter from plaintiff to the Mayor reiterating the re-moval proposal. The Mayor responded that he was referring plaintiff's proposal to his staff to see what could be done.

The City thereafter purchased the land. At the closing, plaintiff again repeated his proposal and agreed to assist so Symphony # 1 could be saved and, if necessary, moved without damage. The City's re-sponse was that plaintiff would be contact-ed in the event the sculpture was to be removed. Shortly thereafter, the City awarded a contract to demolish the sculp-ture, and demolition followed, all without prior notice to plaintiff or the Company. This lawsuit resulted in which summary judgment was allowed for plaintiff. How-ever, his victory was not entirely satisfac-tory to him, nor was the City satisfied. The City appealed, and plaintiff cross-ap-pealed.

## II. ANALYSIS

Although recognized under the Berne Convention, the legal protection of an art-ist's so-called "moral rights"[2] was contro-versial in this country. The United States did not join the Berne Convention until 1988 when it did so in a very limited way.[3] Then Congress followed up by enacting VARA in 1990, with this explanation found in the House Reports:

> An artist's professional and personal identity is embodied in each work creat-ed by that artist. Each work is a part of his or her reputation. Each work is a form of personal expression (oftentimes painstakingly and earnestly recorded). It is a rebuke to the dignity of the visual artist that our copyright law allows dis-tortion, modification and even outright permanent destruction of such efforts.

H.R.Rep. No. 101–514, at 15 (1990), *re-printed in* 1990 U.S.C.C.A.N. 6915, 6925.

VARA seems to be a stepchild of our copyright laws, but does not require copyright registration. Some remedies

---

1. See Appendix for a photographic copy of the sculpture.

2. *See,* Martin A. Roeder, *The Doctrine of Mor-al Right, A Study in the Law of Artists, Authors and Creators,* 53 Harv.L.Rev. 554 (1940).

3. *See* S.Rep. No. 100–352 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3706.

under the Copyright Act, however, including attorney's fees, are recoverable. 17 U.S.C. §§ 504–05. VARA provides: "[T]he author of a work of visual art . . . shall have the right . . . to prevent any destruction of a work of *recognized stature,* and any intentional or grossly negligent destruction of that work is a violation of that right." 17 U.S.C. § 106A(a)(3)(B) (emphasis added). The district court considered Symphony # 1 to be of "recognized stature" under the evidence presented and thus concluded that the City had violated plaintiff's rights under VARA. That finding is contested by the City.

■ "Recognized stature" is a necessary finding under VARA in order to protect a work of visual art from destruction. In spite of its significance, that phrase is not defined in VARA, leaving its intended meaning and application open to argument and judicial resolution. The only case found undertaking to define and apply "recognized stature" is *Carter v. Helmsley–Spear, Inc.,* 861 F.Supp. 303 (S.D.N.Y. 1994), *aff'd. in part, vacated in part, rev'd in part,* 71 F.3d 77 (2nd Cir.1995).[4] Involved was an unusual work of art consisting of interrelated sculptural elements constructed from recycled materials, mostly metal, to decorate the lobby of a commercial building in a borough of New York City. *Carter II,* 71 F.3d at 80. Part of the work was "a giant hand fashioned from an old school bus, [and] a face made of automobile parts. . . ." *Id.* Although the Second Circuit reversed the district court and held that the work was not a work of visual art protected by VARA, *id.* at 88, the district court presented an informative discussion in determining whether a work of visual art may qualify as one of "recognized stature." *See Carter I,* 861 F.Supp. at 324–26. That determination is based greatly on the testimony of experts on both sides of the issue, as would ordinarily be expected. *See id.*

The stature test formulated by the New York district court required:

(1) that the visual art in question has "stature," i.e. is viewed as meritorious, and (2) that this stature is "recognized" by art experts, other members of the artistic community, or by some cross-section of society. In making this showing, plaintiffs generally, but not inevitably, will need to call expert witnesses to testify before the trier of fact.

*Carter I,* 861 F.Supp. at 325.

Even though the district court in this present case found that test was satisfied by the plaintiff's evidence, plaintiff argues that the *Carter v. Helmsley–Spear* test may be more rigorous than Congress intended. That may be, but we see no need for the purposes of this case to endeavor to refine that rule. Plaintiff's evidence, however, is not as complete as in *Carter v. Helmsley–Spear,* possibly because Symphony # 1 was destroyed by the City without the opportunity for experts to appraise the sculpture in place.

■ The City objects to the "stature" testimony that was offered by plaintiff as inadmissible hearsay. If not admitted, it would result in plaintiff's failure to sustain his burden of proof. It is true that plaintiff offered no evidence of experts or others by deposition, affidavit or interrogatories. Plaintiff's evidence of "stature" consisted of certain newspaper and magazine articles, and various letters, including a letter from an art gallery director and a letter to the editor of *The Indianapolis News,* all in support of the sculpture, as well as a program from the show at which a model of the sculpture won "Best of Show." After reviewing the City's objection, the district court excluded .plaintiff's "programs and awards" evidence as lacking adequate foundation, *Martin I,* 982 F.Supp. at 631 n. 1, but nevertheless found Martin had met his "stature" burden of proof with his other evidence. *Id.* at 630–31.

**4.** This Second Circuit case provides a good    general review of the development of VARA.

Included in the admitted evidence, for example, was a letter dated October 25, 1982 from the Director of the Herron School of Art, Indiana University, Indianapolis. It was written to the Company and says in part, "The proposed sculpture is, in my opinion, an interesting and aesthetically stimulating configuration of forms and structures." *The Indianapolis Star*, in a four-column article by its visual arts editor, discussed public sculpture in Indianapolis. This article included a photograph of Symphony # 1. The article lamented that the City had "been graced by only five pieces of note," but that two more had been added that particular year, one being plaintiff's sculpture. It noted, among other things, that Symphony # 1 had been erected without the aid of "federal grants" and without the help of any committee of concerned citizens. Other public sculptures came in for some criticism in the article. However, in discussing Symphony # 1, the author wrote: "Gleaming clean and abstract, yet domestic in scale and reference, irregularly but securely cabled together, the sculpture shows the site what it might be. It unites the area, providing a nexus, a marker, a designation, an identity and, presumably, a point of pride."

The district judge commented on the City's hearsay objection to plaintiff's admitted evidence as follows:

The statements contained within the proffered newspaper and magazine articles and letters are offered by Martin to show that respected members of the art community and members of the public at large consider Martin's work to be socially valuable and to have artistic merit, and to show the newsworthiness of Symphony # 1 and Martin's work. *These statements are offered by Martin to show that the declarants said them,* not that the statements are, in fact, true.... The statements contained within the exhibits show how art critics and the public viewed Martin's work, particularly Symphony # 1, and show that the sculp-

ture was a matter worth reporting to the public. Therefore, the statements contained within these challenged exhibits are not hearsay because they are not being offered for the truth of the matters asserted therein.

*Martin I,* 982 F.Supp. at 630 (emphasis added).

■ We agree with the assessment made by the district court. The City urges the application of the usual hearsay cases such as *Eisenstadt v. Centel Corp.,* 113 F.3d 738 (7th Cir.1997). In *Eisenstadt,* this court held it was an abuse of discretion in a securities fraud action for the district court to admit a newspaper article which attributed pertinent comments to the corporation and its agents. *Id.* at 744–45. That was clearly inadmissible hearsay, offered for the truth of the hearsay. *Id.* at 745. That may be distinguished from the very limited use of the evidence in this case, admitted only to show Symphony # 1 had not gone unnoticed.

A closer case offered by the City is *Grossman v. Waste Management, Inc.,* 589 F.Supp. 395 (N.D.Ill.1984). There the district court admitted news articles to show that information about a proposed waste site was available to the market, but those articles were not to be used to show public opposition to the waste site. *Id.* at 414 n. 8. In the present case, the author of the letter and the newspaper writer were not reporting as the truth what others reportedly said about the sculpture, but only expressing their own opinions. We find the article and the letter, as examples, admissible for this unique and limited purpose as the district court permitted.

■ Next the City claims that the Project Agreement entered into pre-VARA by plaintiff and the City encompassed many of plaintiff's rights under VARA. Therefore, the City argues, that whereas plaintiff failed to remove his work within the time allowed in the contract, plaintiff waived any cause of action he might have

had under VARA. That failure was the City's, not plaintiff's, as under the Agreement the City was obligated to give the owners of the land and the sculpture ninety days to remove the sculpture. The City, after discussing with the Company and plaintiff possible other uses for the tract and the removal proposal, failed to give the required notice and went ahead and demolished the sculpture. Nothing had happened between the parties prior to that which could constitute a waiver of any rights by the Company or plaintiff. Plaintiff had no notice of the City letting a contract for Symphony # 1's demolition and no notice when that demolition would actually occur. After the preliminary and ongoing discussions plaintiff and the Company had with the City, when there was no immediate threat of imminent demolition, plaintiff had the right to continue to rely on the specific notice provided in the Agreement, unless it had been waived, which it was not.

Plaintiff and the Company had proposed a solution if the sculpture was to be moved. That proposal was still pending when the surprise destruction of Symphony # 1 occurred. Prior to the demolition, nothing more had been heard from anyone, including the Mayor. Bureaucratic ineptitude may be the only explanation. Under 17 U.S.C. § 106A(e)(1), an artist may waive VARA rights "in a written instrument signed by the author," specifying to what the waiver applies. There is no written waiver instrument in this case which falls within the VARA requirements. We regard this argument to be without merit.

In spite of the City's conduct resulting in the intentional destruction of the sculpture, we do not believe under all the circumstances, particularly given the fact that the issue of VARA rights had not been raised until this suit, that the City's conduct was "wilful," as used in VARA, 17 U.S.C. § 504(c)(2), so as to entitle the plaintiff to enhanced damages. This appears to be a case of bureaucratic failure within the City government, not a wilful violation of plaintiff's VARA rights. As far as we can tell from the record, those VARA rights were unknown to the City. The parties proceeded under their pre-VARA agreement which the City breached. However, plaintiff retained his VARA rights. As unfortunate as the City's unannounced demolition of Symphony # 1 was, it does not qualify plaintiff for damages under VARA.

The City also claims that the district court abused its discretion in awarding costs and attorney's fees to plaintiff. The City recognizes that a deferential standard of review of the district court's determination is applicable. See *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1012 (2nd Cir.1995) (citation omitted). In view of the preceding discussion of this case we find no abuse of discretion and deem the City's fee arguments to be without merit.

Being fully satisfied with the district court's careful resolution of these unique issues and the resulting judgment, the district court's finding is affirmed in all respects.

Symphony # 1 by Jan Randolph Martin

MANION, Circuit Judge, concurring in part and dissenting in part.

Like my colleagues, I am not an art critic. So I begin with the well-worn adage that one man's junk is another man's treasure. No doubt Jan Martin treasured what the city's bulldozers treated as junk. At this point in the litigation this court is not in a position to attach either label (or perhaps one falling somewhere in between) to Symphony # 1. For the Martin sculpture to receive protection under the Visual Arts Rights Act (VARA), it has to rise to the statutory level of "recognized stature." Because at this summary judgment stage, at least, it has clearly not merited the protection that goes with that description, I respectfully dissent.

Another well-worn adage advises that you should never look a gift horse in the mouth. Of course anyone who has ever accepted a gift horse that turns out to be lame or otherwise infirm quickly understands the error of that advice when the feed and veterinary bills arrive. When the City acquired several tracts of land for urban renewal, Martin's Symphony # 1 remained in place on one of the tracts. Mar-

tin offered to donate the sculpture to the City if it would remove and relocate it to another site. The City examined this "gift" and determined it would have cost it $8,000 to relocate, so it declined the offer. But it did agree to notify Martin in advance of any renewal project so he could remove Symphony # 1 if he so chose. Although it appears that Martin was fully aware that the sculpture's days were numbered, the City did not send him an official notice before the bulldozer moved in. If this were a simple breach of contract claim (albeit not a federal case), damages could well be in order. Instead, this is a federal claim under VARA, and different standards apply.

Of course, VARA was not designed to regulate urban renewal, but to protect great works of art from destruction and mutilation, among other things. 17 U.S.C. § 106A(a). In order to restrict VARA's reach, the Act was limited to preventing destruction of works of art that had attained a "recognized stature." 17 U.S.C. § 106A(a)(3)(B). The court correctly notes that a natural reading of this term indicates that it has two elements (which

correspond to its two words): (1) merit or intrinsic worth; and (2) a public acknowledgment of that merit by society or the art community. As the district court in *Carter v. Helmsley–Spear, Inc.* stated: "the recognized stature requirement is best viewed as a gate-keeping mechanism—protection is afforded only to those works of art that art experts, the art community, or society in general views as possessing stature." 861 F.Supp. 303, 325 (S.D.N.Y.1994), *rev'd in part and aff'd. in part,* 71 F.3d 77 (2d Cir.1995). So I concur with the court on this point.

I dissent, however, because summary judgment is not appropriate here. A plaintiff cannot satisfy his burden of demonstrating recognized stature through old newspaper articles and unverified letters, some of which do not even address the artwork in question. Rather, as the district court stated in *Carter,* in "making this showing [of recognized stature] plaintiffs generally, but not inevitably, will need to call expert witnesses to testify before the trier of fact." 861 F.Supp. at 325. Instances where expert testimony on this point is not necessary will be rare, and this is not one of those exceptional cases where something of unquestioned recognition and stature was destroyed. Furthermore, where newspaper articles are admitted into evidence only to acknowledge recognition but not for the truth of the matter asserted (that the art in question was good or bad), a plaintiff needs more to overcome *a defendant's* motion for summary judgment on a VARA claim, much less prevail on his own summary judgment motion. While the very publication of newspaper articles on a work of art may have bearing on the "recognized" element, there has to be some evidence that the art had stature (i.e., that it met a certain high level of quality). The newspaper articles are hearsay and not admitted for the truth of the matter asserted in them. Construed in the light most favorable to the defendant, they cannot demonstrate by a preponderance of the evidence that the plaintiff's art was of a recognized stature, and that no reasonable jury could find otherwise. Experts need to weigh in here, and the trial court and perhaps this court need to come up with a clearer definition of when works of art achieve "recognized stature."

For now, however, those who are purchasers or donees of art had best beware. To avoid being the perpetual curator of a piece of visual art that has lost (or perhaps never had) its luster, the recipient must obtain at the outset a waiver of the artist's rights under VARA. *See* 17 U.S.C. § 106A(e). Before awarding building permits for erection of sculptures, municipalities might be well advised to obtain a written waiver of the artist's rights too. If not, once destroyed, art of questionable value may acquire a minimum worth of $20,000.00 under VARA.